649 So.2d 103 (1995)
Mack A. McCOY, Plaintiff-Appellant,
v.
CITY OF SHREVEPORT FIRE DEPARTMENT, Defendant-Appellee.
No. 26,181-CA.
Court of Appeal of Louisiana, Second Circuit.
January 25, 1995.
*104 Broussard, Bolton, Halcomb & Vizzier by Daniel E. Broussard, Jr., for appellant.
Jerald N. Jones, City Atty., Lawrence K. McCollum, Asst. City Atty., for apppellee.
Before MARVIN, SEXTON, BROWN, WILLIAMS and STEWART, JJ.
MARVIN, Chief Judge.
LSA-Const. Art. 5, § 8, mandated a reargument of this appeal before a five-judge panel when one judge of the original three-judge panel dissented to an opinion reversing the judgment of the Worker's Compensation Hearing Officer.
Mack McCoy, a captain in the Shreveport Fire Department, appeals a judgment dismissing his claim for worker's compensation benefits for the period March 24October 5, 1992. McCoy was disabled from working during this time because he had to have a pacemaker surgically implanted to correct an abnormally slow heartbeat that was caused by a disorder in his autonomic nervous system that arose while McCoy was on duty.
The issue in this appeal is whether the evidence relating to his disability is legally sufficient to overcome or rebut the work-related causation presumption of LRS 33:2581, the Heart and Lung Disease Act, applicable to a fireman. The "difficult (almost impossible) burden" of overcoming the statutory presumption (proving a negative) was discussed in Rothell v. City of Shreveport, 626 So.2d 763, 766 (La.App. 2d Cir. 1993), writ denied. Rothell was decided by this court after the Worker's Compensation Hearing Officer rendered her opinion in McCoy's action.
We reverse and render judgment for McCoy.

McCOY'S CONDITION
McCoy first became aware of the condition on March 24, 1992, when he was taken from the fire station to the hospital with chest pain, diagnosed as pericarditis, an inflammation of the lining of the heart. While in the emergency room, McCoy fainted and his heart stopped beating for a few seconds. A disorder of the vagus nerve in his autonomic nervous system was determined to have caused his heart to stop beating. Cardiovascular diagnostic tests revealed that no structural abnormalities or arterial blockage affected his heart. Once the pacemaker stabilized his heartbeat McCoy returned to his former duties with the fire department on October 5, 1992.
McCoy had been with the fire department for over 20 years. The City denied McCoy's claim for weekly compensation benefits, contending McCoy's temporary disability was not work-related, asserting that neither the underlying nervous condition nor the resulting heartbeat problem was related to his work. The City does not dispute, however, *105 that McCoy's condition was a "disease or infirmity of the heart" within the statutorily provided presumption of LRS 33:2581. We emphasize the statutory presumption:
Any disease or infirmity of the heart ... which develops during a period of employment in the classified fire service in the state of Louisiana ... shall be presumed, prima facie, to have been caused by or to have resulted from the nature of the work performed whenever the same is manifested at any time after the first five years of employment.
While not disputing that McCoy suffered a "disease or infirmity of the heart" under § 2581 on March 24, 1992, the City contended below and here that neither the underlying condition, nor the manifestation of symptoms of the condition, was related to McCoy's work.

FACTS
The vagus nerve traverses the carotid sinus area of the neck and transmits nerve impulses from the brain to the sinus node of the heart where the pace of the heartbeat is "propagated." The vagus nerve is part of the parasympathetic nervous system, which operates throughout the body to slow things down. Its counterpart in the autonomic nervous system, called the sympathetic nervous system, speeds things up. The two systems must be in balance for the body to function normally. McCoy's vagus nerve was overactive, meaning that it slowed his heartbeat too much. In this record, his condition was variously called by experts, the sick sinus syndrome, carotid sinus hypersensitivity, or sinus node dysfunction.
McCoy began having chest pain at the fire station while on duty at about 6:30 a.m. on March 24, 1992, about a half hour after he awoke. He had had a headache the night before, which returned shortly after he awoke. He did not sleep well during the night, even though there were no "runs" or calls to duty that night.
Around 7:00 a.m., a fire department medic performed an EKG on McCoy before he was taken by ambulance to Willis-Knighton Hospital. He was given nitroglycerin and other heart medication. An IV was inserted in his arm en route. When he got to the hospital emergency room, a second IV was placed in his other arm. Shortly after hospital personnel began running an EKG, McCoy's heart stopped beating for perhaps five seconds and he lost consciousness. He was revived and sent to the cardiac care unit for a few days until the cause of the problem was identified. While there, he had no more episodes of either cardiac standstill or fainting.
The City's cardiologist, Dr. Thomas Brown, who treated McCoy, consulted with Dr. Pratap Reddy, a specialist in cardiac electrophysiology, after diagnostic tests revealed no abnormality in the heart itself. Studies performed by Dr. Reddy confirmed Dr. Brown's suspicion that McCoy's vagus nerve was overactive, causing the abnormal slowing of his heartbeat. Dr. Brown thereafter surgically implanted a pacemaker to regulate McCoy's heartbeat. After recuperating from the surgery, McCoy was able to return to his former work on October 5, about six months later. He has had no further heart irregularities.
Both doctors generally believed that McCoy's nerve disorder was not work-related, notwithstanding McCoy's testimony that he was under great mental stress at work in the month preceding March 24, 1992. McCoy gave three sources of stress. Others corroborated the occurrence of these incidents, but not their effect on McCoy:
(1) His station, which serviced the Shreveport Regional Airport, failed an on-site test or inspection by the Federal Aviation Administration in late February 1992. Although McCoy's shift was not involved in the test, everyone at the station received intensified training to prepare for another inspection by FAA, expected to be held within the next few months. If the airport were to stop using the fire department, the department would lose nine captain's positions and 18 driver's positions. McCoy's job was not at risk, but he did not want the department to lose these opportunities for others to advance.
(2) About a week before March 24, 1992, a fireman came to work with the smell of alcohol on his breath. The fireman was the son of McCoy's former supervisor and longtime *106 friend. McCoy reported the incident to the assistant fire chief, as a result of which the fireman was suspended for 30 days and his father has since refused to speak to McCoy. McCoy found it very stressful to be torn between his friendship with the father and his duty to prevent the son from working while impaired.
(3) A few days before March 24, 1992, McCoy's crew disobeyed his order to pick up cigarette butts that others had discarded in the station yard. The crew complied with the order only after having a heated argument with McCoy and after the assistant fire chief reiterated the order.
At some unspecified time during the month preceding March 24, 1992, McCoy began having tension headaches and tightness in his neck and shoulders as a result of one or more of these upsetting events. The headaches continued through March 24.
McCoy testified that he had had only one other episode of chest pain before March 24, which was less intense than his pain on March 24. McCoy said the first episode occurred earlier that month, shortly before he reported to work, and lasted for only about 30 minutes. Dr. Brown testified that the emergency room doctor, who first examined McCoy, told him that McCoy "had been having some chest pain off and on for several months," although not as severe as the chest pain he experienced on March 24.

MEDICAL EVIDENCE
Questions to the doctors about the causal relationship between McCoy's work and his heart problems distinguished between McCoy's underlying condition, the disorder in his autonomic nervous system that affected his heartbeat, and his manifestation of symptoms of the abnormality, particularly when McCoy's heart stop beating and he "blacked out" in the hospital emergency room.
According to Dr. Brown, the chest pain McCoy experienced on March 24 resulted from pericarditis, an inflammation of the lining of the heart, but was not related to the condition of his nervous system which caused him to black out.

The Nervous System Disorder
Drs. Brown and Reddy agreed that McCoy's work, more probably than not, did not cause wholly or partly McCoy's carotid sinus hypersensitivity, a disorder that simply occurs in some patients for unknown reasons. McCoy was 42 years old when he first became aware of the condition in 1992. According to the doctors, age 42 is younger than the usual age of manifestation in patients who develop the condition with aging, and older than the usual age of manifestation if the condition is congenital.
When asked whether McCoy's physical activities as a fire fighter caused his disorder to develop, Dr. Brown, an expert in cardiology, testified:
I cannot totally rule it out, though from the information that I have, my feeling is still that it did not have anything to do with his employment.
Dr. Reddy, a locally-based and nationally-renowned expert in the narrower field of cardiac electrophysiology, which encompasses McCoy's specific disorder, unequivocally ruled out McCoy's physical work as a fire fighter as the cause of his nervous system disorder. The doctors agreed that the nervous system disorder was not caused or exacerbated by work-related mental stresses of the type that McCoy described.
Although neither doctor could say affirmatively what caused McCoy's nervous system disorder, both doctors thought or believed generally that the disorder, more probably than not, was not caused by the physical or mental aspects of McCoy's work.

Infirmity of the Heart
The doctors were questioned about the three stressful incidents at the fire station in the preceding days and weeks (FAA inspection, alcohol incident and insubordination) which McCoy said caused him to experience anxiety, tension headaches, chest pain and fatigue on March 23-24. Both doctors were questioned about the correlation between these job-related stresses and the temporary stoppage of McCoy's heartbeat and his blackout on March 24.
The doctors acknowledged that job-related mental stress or anxiety, while not the cause *107 of McCoy's nervous system condition, could have caused his "manifestation of symptoms" on March 24, 1992, when McCoy's heart stopped beating for a few seconds. They opined, however, that any blackout attributable to anxiety would have occurred almost instantaneously with the stressful event. Because the latest of the three stressful events McCoy described had occurred several days before March 24, both doctors expressed disbelief that the anxiety McCoy experienced from those events caused or contributed to his blackout on March 24.
The doctors testified that physical pain or the subjective perception of pain may trigger overstimulation of the vagus nerve. As with mental stress, however, the blackout typically occurs as soon as the pain is felt or perceived. McCoy's blackout in the hospital emergency room occurred around 8:15 a.m., more than 90 minutes after he awoke at 6:30 a.m. with a tension headache and chest pain. McCoy said the headache worsened when he was given nitroglycerin in the ambulance on the way to the hospital, under the mistaken belief that he was having a heart attack. McCoy did not then lose consciousness, however, or when the first IV was inserted in his arm en route to the hospital.
McCoy arrived at the hospital before 8:15 a.m. Shortly after hospital personnel inserted the second IV and began running an EKG on McCoy about 8:15 a.m., McCoy said, "I'm feeling faint," and passed out. The EKG monitor documented that McCoy's heart stopped beating for about five seconds. McCoy recalled having fainted only once before, in 1984, when getting an injection for a shoulder injury.
Dr. Reddy surmised that the insertion of the second IV may have or could have triggered McCoy's blackout. He explained, however, that even a patient who does not have chronic hypersensitivity of the vagus nerve, as McCoy did, may suddenly pass out upon seeing a needle or getting an injection. According to Dr. Reddy, a patient with carotid sinus hypersensitivity, such as McCoy, may have a blackout at any time, regardless of his level of physical activity, pain, anxiety, etc.
The final job-related stress that McCoy asserted as a basis for his manifestation of symptoms was fatigue. He said did not sleep well on the night of March 23, and he awoke a full hour before the station's 7:00 a.m. wakeup call on March 24, because he was disturbed by the three recent incidents that had occurred at the station. According to Dr. Brown, however, fatigue generally causes a person's heart rate to increase, rather than to decrease as McCoy's did.
After being questioned about McCoy's occupation in general, and about each of the specific job-related stresses that McCoy said he experienced in the days and weeks before his blackout, each doctor generally reiterated his respective belief or opinion that McCoy's "manifestation of symptoms" on March 24, 1992, was, more probably than not, unrelated to his work.

DISCUSSION
LRS 33:2581 creates a presumption that the nature of a fire fighter's work caused, contributed to, accelerated or aggravated his heart disease or infirmity which manifests itself after the first five years of employment. Rothell v. City of Shreveport, supra, and authorities cited therein.
From the medical evidence, the WCHO found that McCoy's heart disorder "was in no way related to, aggravated by, or connected with [his] employment." We must decide whether the WCHO erred in concluding that the totality of the evidence was legally sufficient to rebut the § 2581 presumption by a preponderance of the evidence.
The WCHO found that the cases cited by McCoy, in which benefits were awarded to the fireman on findings that the presumption was not rebutted, were factually distinguishable. Rothell v. City of Shreveport, supra, was decided by this court shortly after the WCHO rendered its judgment and reasons therefor. See McKenzie v. City of Bossier City, 585 So.2d 1229 (La.App.2d Cir.1991); Brown v. City of Monroe, 521 So.2d 780 (La.App. 2d Cir.1988); Saling v. City of New Orleans, 398 So.2d 1205 (La.App. 4th Cir. 1981), writ denied; Vincent v. City of New Orleans, 326 So.2d 401 (La.App. 4th Cir. 1975), writ denied.
*108 In each of these cases, the medical evidence was either entirely supportive of the presumption (Brown, Vincent), or was equivocal about causation, but the issue was consistently resolved in the fireman's favor either by the trier of fact or by the appellate court reversing the trial court (Rothell, McKenzie, Saling). No reported case considering the presumption applicable to a firefighter is cited to us where the presumption was rebutted.

CONCLUSION
A 1975 amendment (Act 30 of 1975) broadened the LRS 33:2581 presumption to its present language. Vincent v. City of New Orleans, cited supra, writ refused, noted the distinction between the coverage of the Heart and Lung Act and the coverage of the worker's compensation statute (LRS 23:1031.1), stating:
By providing that the "disease is presumed, prima facie, to have developed during the employment," the legislature did, we believe, effectively shift the burden of proof to the employer who became obliged to prove the lack of causation between the disease and the employment. This ... imposes an onerous task upon the employer, but this was, we believe, intended by the legislature.... [U]nless affirmative proof is adduced to prove a lack of causation... the presumption requires that the disabled fireman be entitled to coverage under the Act.
326 So.2d at 403. Our emphasis.
On rehearing, the court recognized the plight of the city being in such a "totally unsatisfactory position," "the presumption being ... almost impossible to rebut ..., being obliged to prove a negativeVincent's heart disability could not have resulted from his service as a firefighter." The court concluded,
But, upon painstaking re-examination, we must conclude that the statute cannot fairly be construed in any way other than ... in our original opinion.
326 So.2d at 405
We said as much in Rothell, supra, citing Vincent and other authorities. In both cases, the supreme court denied writs. While each case, including those cited supra, interpreting the Act must rest on its own peculiar facts, it has been generally noted that the legislature has acknowledged that a firefighter, as a result of the stress and strain of his work, is predisposed to heart problems and that a firefighter, disabled because of heart problems, is entitled to the benefit of the presumption. Rothell, supra, citing Landry v. City of New Orleans, 266 So.2d 492 (La.App. 4th Cir.1972), and Vincent, supra.
As in the other reported cases, the medical opinion (more probably than not), that generally negates that the fireman's work was the cause of the heart disability, is tempered by acknowledgements, agreements, or concessions that the work may have been a cause, even though remote, or possibly a contributing factor. This record contains such acknowledgements: "I cannot totally rule it out...," "it could have caused," "[the work] could have possibly contributed," "Well, you could say that, but ... it would be hard to relate to [his work or stress]." See testimony quoted or summarized supra.
McCoy's initial chest pain while on duty as a fireman was diagnosed as being pericarditis, an inflammation of the lining of the heart, but was said probably not caused by the nervous system disorder. While the nervous system disorder was probably not caused by McCoy's work, the disorder, nonetheless, caused his heart to stop beating while in the hospital, leading first to the conclusion that he had no structural impairment of the heart or arterial blockage, and secondly to the necessity of surgically implanting the pacemaker to stabilize his heartbeat.
Under these circumstances and in light of the City's effective concession that McCoy had "a disease or infirmity of the heart" within the meaning of LRS 33:2581, this record does not allow the conclusion that the statutory presumption that McCoy's heart "infirmity" "resulted" from his work has been rebutted. McCoy's six-month disability arising out of the surgical implant of the pacemaker is compensable under the w.c. and the Heart and Lung Acts.
*109 To rebut the statutory presumption the City had the difficult, almost impossible burden of proving the negativethat McCoy's infirmity of the heart could not have resulted from his service as a fireman. Again we recognize the plight of the City by virtue of what the legislature has declared. Vincent; Rothell, supra.
Contrary to the findings of the WCHO, we find the evidence in this record legally insufficient to rebut the presumption. We shall reverse and render judgment accordingly.

ATTORNEY FEES
Robert A. Marts, the w.c. claims manager for the City, denied McCoy's claim for medical expenses and benefits "based on medical reports" solicited from Dr. Brown and Dr. Reddy. Marts inquired on April 29, 1992, to Dr. Brown and later to Dr. Reddy and had the benefit of their reports. In his letter of April 29, 1992, addressed to Dr. Brown, Mr. Marts states:
Thank you for your recent report concerning Mack McCoy. I read it carefully, then read the appropriate text in the MERCK manual. * * *
As you will probably remember from the Rothell claim, firefighters have the mistaken notion that, after five years of service in that capacity, anything that affects their heart or lungs is job related. But that is an erroneous interpretation, as the Heart and Lung Act only creates a presumption of fault. * * *
Judging from what I read in Merck, I am left with the impression that Mr. McCoy's condition is probably not influenced by his external environment, with the exception of sudden and profound stress. If that is valid, can we rule out stress that is cumulative?
Now that Mr. McCoy has a pacemaker, can he function normally in an occupation where he will occasionally have to endure the stress of the unexpected, and the rigors of fighting a fire? ... * * *
To Dr. Reddy on June 15, 1992, Marts enclosed a copy of his correspondence to and from Dr. Brown:
As you will note from the information I have provided, the circumstances leading to Capt. McCoy's collapse do not readily point to a job-related medical condition. Hence, I have not authorized compensation. * * *
We hope you can define the etiology of Capt. McCoy's heart problem. After receiving replies from Dr. Brown and Dr. Reddy, Marts wrote McCoy on August 6, 1992, denying McCoy's w.c. claim and saying:
... we have consulted with an independent medical expert who does not equate your condition with an occupational source.
The testimony of Dr. Brown and Dr. Reddy, earlier quoted or summarized, tracks what they respectively wrote and gave to Marts, e.g., Dr. Reddy's initial impression:
1. Chest pain of unknown etiology possibly due to acute pericarditis, but not due to myocardial infarction.
2. Witnessed syncope associated with asystolic pauses, the etiology of which is undetermined.
3. History of syncope in the past; Dr. Reddy's later answers to Marts' inquiries: "[McCoy] has ... sick sinus syndrome which is a disorder of electrical impulse formation and its propagation within the heart.... this disorder ... was primarily due to abnormally functioning autonomic nervous system resulting in symptoms and requiring implantation of permanent pacemaker.... it is up to you to make the decision whether or not he is entitled to workers compensation...."
Dr. Brown's answers to Marts' inquiries, as we have quoted or summarized above, were similar: "My feeling is [his work] probably did not [cause his nerve system disorder] but I cannot definitely say either way."
Marts knew in August 1992 when he denied McCoy's claim what the medical evidence revealed. McCoy had pericarditis (chest pains) and other symptoms of a heart attack on the morning of March 24, 1992. After extensive studies were done, it was learned that his heart stopped beating because of a nervous system disorder of unknown etiology and that he required a pacemaker *110 to correct this disorder's "propagation in the heart."
In Rothell, supra, we noted that "Mr. Marts was mistaken about the proof required to rebut the statutory presumption ... [and that] he incorrectly believed that proof of other factors which caused or contributed to the heart attack would be sufficient to rebut the statutory presumption." 626 So.2d at p. 769. In short, Mr. Marts again failed to distinguish who has what burden of proof in the ordinary w.c. cardiovascular disability case from the case of a fireman under the Heart and Lung Act.
Again we shall find the City was arbitrary, capricious and without probable cause in its failure to pay a claim within 60 days of notice. LRS 23:1201.2. A mistaken interpretation of the law does not shield an employer from the effect of LRS 23:1201. McCoy is entitled to penalties in accord with LRS 23:1201 and reasonable attorney fees, which on this record, as in Rothell, supra, we assess at $3,000.

DECREE
At appellee's cost, here and below, we reverse and render judgment for the claimant, McCoy, and against the defendant-employer, the City of Shreveport, for weekly w.c. benefits for the period March 24 to October 5, 1992, and for all medical expenses incurred in McCoy's treatment and hospitalization by Drs. Brown and Reddy during that period, together with the penalties on the amounts due as provided in LRS 23:1201 E, and for $3,000 reasonable attorney fees and for legal interest on such sums that may be due under this judgment from the date of this judgment until paid. All costs, below and here, are assessed to the defendant City insofar as the law allows.
REVERSED AND RENDERED.
SEXTON, Judge, dissenting.
My initial disagreement with the majority opinion is the statement therein that the city did not dispute that McCoy suffered a disease or infirmity of the heart per LSA-R.S. 33:2581. My view of the city's position is that it did not concede that circumstance, but alternatively contended that even if so, it had rebutted the prima facie presumption that any infirmity or disease was caused by or related to McCoy's employment as a firefighter.
The record is abundantly clear that the plaintiff's abnormality or defect is in the vagus nerve, which as one of its functions, assists in the regulation of the heartbeat. As the trial court correctly pointed out, the defendant did not have a heart attack or any structural problem with the heart or arteries. He did have a "sick sinus syndrome" or "carotid sinus hypersensitivity." Certainly, this defect in the plaintiff's nervous system affected his heart in that it caused it to slow down inordinately. Whether this is actually a disease or infirmity of the heart, or is one of the central nervous system, is, I suggest, open to serious question. The trial judge did not analyze the case from this standpoint. My view of the record is that the question is not clearly addressed by the medical experts.
However, the trial court did emphatically determine that the statutory prima facie employment presumption had been rebutted.
One of the two medical experts, Dr. Brown, a cardiologist, expressed his feeling that plaintiff's work or job did not affect this condition (R. 139-40) and that in his opinion it was not work-related (R. 146), though he could not say his opinion on the question was 100 percent. As a cardiologist, Dr. Brown deals with adult vascular disease and was the initial treating physician because heart trouble was the presumed diagnosis.
Plaintiff's medical problem is more in the field of Dr. Reddy, one of the more expert cardiovascular electrophysiologists in the United States. Dr. Reddy, who practices in Shreveport, was called in after Dr. Brown suspected that McCoy's problem was related to the vagus nerve. Dr. Reddy categorically ruled out the plaintiff's work or job as a factor. (R. 155) He said that stress does not contribute to this condition. (R. 155) He specifically considered the stress plaintiff cited and said that it had nothing to do with the condition. (R. 155) He later emphasized that stress can not cause the condition (R. 179). He also said that outside factors played no part (R. 180). He said that the *111 condition is not work-related (R. 183). On that same page of the record he again said job stress does not cause a development of this condition and that it is unrelated to plaintiff's employment as a firefighter.
On this record, the majority has overturned the trial court's factual determination that the prima facie presumption of LSA-R.S. 33:2581 has been rebutted. The majority never specifically says that this trial court factual finding was clearly wrong. They simply say the city had the "almost impossible burden of proving the negativethat McCoy's infirmity of the heart could not have resulted from his service as a fireman."
Presumably, the authority for this proposition is Vincent v. City of New Orleans, 326 So.2d 401 (La.App. 4th Cir.1975), writ denied, 329 So.2d 760 (La.1976). The aforesaid statement quoted from the majority opinion is a virtual verbatim rendition of part of footnote 2 in Vincent. Unfortunately, this statement was reiterated in Rothell v. City of Shreveport, 626 So.2d 763 (La.App. 2d Cir. 1993), writ denied, 634 So.2d 379 (La.1994). Rothell can and should easily be distinguished on the expert medical testimony relating Rothell's job at least in part to the development of his cardiovascular disease.
As Vincent points out, that case dealt with LSA-R.S. 33:2581 prior to its amendment by Act 30 of 1975. The old statute provided that heart or lung disease or infirmity in a firefighter should prima facie be presumed to have developed during that employment. The amendment extended the presumption such that now heart or lung disease or infirmity is also prima facie presumed to have been caused by the employment.
I believe that reliance on this Vincent "impossible burden" dicta is inappropriate in light of the clear statutory statement that the presumption is a prima facie one, which, of course, by definition, means that it can be rebutted. Thus, this treatment by the majority essentially means the presumption is not prima facie and is, therefore, not rebuttable.
The defendant's medical evidence could not have been stronger. I take serious issue with the majority statement that the medical opinion evidence "is tempered by acknowledgements, agreements, or concessions that the work may been a cause, even though remote...." I suggest that to do so, the majority must take Dr. Brown's statement at R. 139-40 out of context. The clear sum of his testimony is that plaintiff's condition was not work related. More importantly, as I emphasized earlier, plaintiff's condition is obviously more precisely within the more narrow speciality of Dr. Reddy who equivocated not a whit.
Further, considering the clear wording of the statute and the medical evidence in the city's possession, I am at a loss to understand how it can be arbitrary and capricious in failing to pay this claim.
I respectfully dissent.