[No. 14163-9-II.    Division Two.    April 27, 1992.]

ROBERT E. MCCLELLAND, *Appellant,* v. ITT RAYONIER, INC., *Respondent.*

*Carol L. Hepburn, Susan M. Landa,* and *Reaugh Fischnaller & Oettinger,* for appellant.

*Calhoun Dickinson* and *Perkins Coie,* for respondent.

GREEN, J.[*] — Robert E. McClelland appeals a Grays Harbor County Superior Court order denying his motion for summary judgment and granting that of ITT Rayonier on review of an order of the Board of Industrial Insurance Appeals that denied McClelland's claim for workers' compensation benefits. The issue before this court is whether McClelland's psychological condition of major depression coupled with "simple phobia" is an occupational disease giving rise to a compensable disability. We affirm.

Robert McClelland was employed at ITT Rayonier's pulp mill for 25 years in a series of progressively more complex and responsible jobs. As his responsibilities increased, he began to perceive himself as unable to handle the work and became preoccupied with fears that he would make a mistake with serious consequences. In 1986, shortly after his last promotion, at age 62, from screen tender to the position of bleacherman, McClelland became even more anxious about his ability to do the work and had recurring thoughts

---

[*]Judge Dale M. Green is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

of suicide. His wife, understandably concerned, had him admitted voluntarily to Fairfax Hospital.

A psychiatrist, Dr. Donald E. Rice, treated McClelland during two stays at Fairfax. Dr. Rice opined that this patient was suffering from a major depressive disorder and simple phobia (fear of the workplace), conditions he attributed to McClelland's employment at ITT Rayonier after hearing McClelland describe the stress he experienced while trying to do his work. Dr. Rice also, however, diagnosed a preexisting brain disorder in Mr. McClelland, *i.e.*, organic cerebral dysfunctions manifested by "constructural dyspraxia and clear visual spatial deficits". According to Dr. Rice, the brain disorder "had nothing to do with" McClelland's depression, but "he has some decrease in elements of his cognitive functioning and his ability to think that might have interfered with his doing some of the sequential operations or some of the organizational tasks that he had with respect to his work." Constructural dyspraxia "means that when he looks at geometric objects and tries to reproduce them someplace else, he's unable to do that well." In addition, McClelland is slightly hearing impaired, has difficulty spelling common words and difficulty finding the right word to say, and has mildly dysarthric speech. When asked in his deposition whether McClelland's cerebral dysfunctions affected his feelings of stress at work, Dr. Rice replied that they

> would impact on his perception of how comfortably he could do the work. I mean, he could experience some of the work tasks as being beyond him or too complex, or there was too much going on for him to manage and prioritize, would lead to that kind of an experience.

Dr. Rice conceded that McClelland's inability to organize tasks could cause him anxiety in any job. Indeed, McClelland confirmed to Dr. Rice that responsibility was stressful for him.

ITT Rayonier put on two witnesses who testified about the nature of McClelland's employment and his reaction to it. Jack Schumacher, ITT's employee relations supervisor, described the jobs in the mill's sulphite department, where

McClelland had his last two jobs, screen tender and bleacherman, and said that those jobs were not unusually stressful or any more stressful than similar production-type jobs found generally in industry (which McClelland concedes), that he was not aware of any other screen tender or bleacherman having filed a claim because of job stress, and that the stress described by McClelland was internal with him rather than inherent in either of those jobs.

ITT's other witness, Dr. Richard Carter, was a psychiatrist who examined McClelland in September of 1987 at the request of the Department of Labor and Industries. He told Dr. Carter that he often felt depressed and nervous and had thoughts of suicide. Dr. Carter diagnosed a major depression, single episode, in partial remission, which he opined did not result naturally and proximately from Mr. McClelland's employment at ITT, which was not unusually stressful. Instead, Dr. Carter concluded essentially that McClelland's depression had two principal, but overlapping causes, one environmental and one organic: the early loss of his father and his "chaotic" childhood, combined with his minimal brain disorder and speech impediment, which made him feel insecure and overly sensitive to the demands of his job, so that he found the job abnormally stressful and became depressed over his inability to cope. Dr. Carter opined that Mr. McClelland's perception of the work situation as highly stressful varied from reality because McClelland "tends to view situations as being more onerous, more stressful than the so-called average individual. This appears to relate to not only his work in the more recent years [at ITT], but to his work in the years considerably in the past." The reason for this perception distortion is that it is "colored by his internal world which is obviously influenced by his chaotic childhood and his brain dysfunctioning, so his perceptions are colored by those earlier experiences."

Mr. McClelland filed a claim with the Department of Labor and Industries for workers' compensation benefits on October 16, 1986, claiming that his major depression combined with

simple phobia was an occupational disease resulting from stressful conditions of his employment. The Department denied the claim. McClelland protested the decision, and the Department affirmed on reconsideration. McClelland then appealed to the Board of Industrial Insurance Appeals. An administrative law judge conducted a hearing and issued a proposed order affirming the Department's decision, and the Board adopted that order on October 12, 1988. McClelland appealed to superior court, which granted summary judgment to ITT. From the court's denial of a motion for reconsideration, McClelland now appeals to this court.

Our review is governed by RCW 51.52.140, which provides that an appeal shall lie from the judgment of the superior court as in other civil cases, and that ordinary practice in civil cases shall apply. The findings and decision of the Board of Industrial Insurance Appeals are considered prima facie correct. The hearing in superior court on review is de novo, but is based on the same evidence and testimony before the Board. RCW 51.52.115; *Du Pont v. Department of Labor & Indus.*, 46 Wn. App. 471, 476, 730 P.2d 1345 (1986). The superior court may substitute its own findings and decision for the Board's if it finds, "from a fair preponderance of credible evidence", that the Board's findings and decision are incorrect. *Weatherspoon v. Department of Labor & Indus.*, 55 Wn. App. 439, 440, 777 P.2d 1084 (1989); *Department of Labor & Indus. v. Moser*, 35 Wn. App. 204, 665 P.2d 926 (1983). As the instant appeal is from a summary judgment in favor of the employer, the role of this court, as in other civil cases, is to decide if the record before the superior court, with all facts and inferences considered in the light most favorable to the nonmoving party (McClelland), demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Wilson v. Steinbach*, 98 Wn.2d 434, 656 P.2d 1030 (1982); CR 56(c). The motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion. *Wilson*, at 437.

■ RCW 51.32.180 provides that a worker suffering disability from an occupational disease shall receive benefits under the Industrial Insurance Act. "Occupational disease" is defined in RCW 51.08.140 as "such disease or infection as arises naturally and proximately out of employment . . .". A worker suffering from a mental disease is eligible for compensation if the mental disease arose naturally and proximately out of his or her employment. *Department of Labor & Indus. v. Kinville*, 35 Wn. App. 80, 88-89, 664 P.2d 1311 (1983), *overruled on other grounds in Dennis v. Department of Labor & Indus.*, 109 Wn.2d 467, 745 P.2d 1295 (1987). In an occupational disease case, it is the resulting *disability*, not the disease, that is compensable. *Bremerton v. Shreeve*, 55 Wn. App. 334, 341, 777 P.2d 568 (1989).

The underlying purpose of industrial insurance was well stated in *Favor v. Department of Labor & Indus.*, 53 Wn.2d 698, 703, 336 P.2d 382 (1959):

> [O]ur workmen's compensation act was not intended to provide workmen with life, health, or accident insurance at the expense of the industry in which they are employed. It was intended to provide, at the expense of the industry employing them, a sure and speedy relief for workmen (or their dependents) where disability or death resulted from injuries sustained in the course of their employment or from occupational diseases arising naturally and proximately from . . . employment.

The *Favor* court went on to describe the means of proving an occupational disease case, in these terms:

> [T]here must be some tangible and provable relationship between the injury or the disease suffered and the employment. This relationship is not to be established on a purely subjective basis.
>
> . . . .
>
> The proof in our occupational disease cases has, in each instance, been objective in character; a condition in the plant or industry that someone else beside[s] the claimant was aware of and could describe.
>
> Statements by a claimant as to purely subjective conditions, peculiar to himself, do not provide the objective circumstances necessary to establish that a claimant's disease arose naturally and proximately from his employment.

(Citations omitted.) 53 Wn.2d at 703-05.

■■ The Industrial Insurance Act is remedial in nature and is to be liberally construed in order to achieve its purpose of providing compensation to all covered employees injured in their employment, with doubts resolved in favor of the worker. *Dennis v. Department of Labor & Indus.*, 109 Wn.2d at 470. Benefits are not limited to those workers in good health. "The worker whose work acts upon a preexisting disease to produce disability where none existed before is just as injured in his or her employment as is the worker who contracts a disease as a result of employment conditions." *Dennis*, at 471. "The worker is to be taken as he or she is, with all his or her preexisting frailties and bodily infirmities." *Dennis*, at 471. Thus, *Dennis* holds that compensation may be due where disability results from work-related aggravation of a preexisting nonwork-related disease. *Dennis*, at 474.

■ The Supreme Court sought in *Dennis* to clarify the law with respect to the statutory requirement that the occupational disease must arise "naturally and proximately" out of the employment. Citing *Simpson Logging Co. v. Department of Labor & Indus.*, 32 Wn.2d 472, 479, 202 P.2d 448 (1949), the court defined proximate cause in this context as a kind of "but for" causation, *i.e.*, the disease (or disability due to aggravation of a nonwork-related disease) had no intervening cause and would not have been contracted but for the "condition" existing in the employment. *Dennis*, at 477. This causal connection between the claimant's physical condition and his or her employment must be established by competent medical testimony showing that the disease is probably, as opposed to possibly, caused by the employment.

Turning to the element of "naturally" arising out of employment, the *Dennis* court held as follows:

> We hold that a worker must establish that his or her occupational disease came about as a matter of course as a natural consequence or incident of distinctive conditions of his or her particular employment. The conditions need not be peculiar to, nor unique to, the worker's particular employment. Moreover, the focus is upon conditions giving rise to the occupational disease, or the disease-based disability resulting from work-

related aggravation of a nonwork-related disease, and not upon whether the disease itself is common to that particular employment. The worker, in attempting to satisfy the "naturally" requirement, must show that his or her particular work conditions more probably caused his or her disease or disease-based disability than [did] conditions in everyday life or all employments in general; the disease or disease-based disability must be a natural incident of conditions of that worker's particular employment. Finally, the conditions causing the disease or disease-based disability must be conditions of *employment*, that is, conditions of the worker's particular occupation as opposed to conditions coincidentally occurring in his or her workplace.

109 Wn.2d at 481.

Considering the "natural" and "proximate" elements in terms of this case, therefore, we must ask if the evidence shows that McClelland's major depression and simple phobia were "probably" caused by the distinctive demands of his particular employment, measured objectively, aggravating his preexisting mental problems, or were they caused simply by his own subjective but unrealistic view of the situation at the pulp mill, or by conditions in everyday life.

Bearing in mind the holding of *Dennis* that a compensable occupational disability can result when conditions of employment aggravate a nonwork-related disease, and resolving doubts in favor of compensation for the injured worker, we still hold that McClelland failed to create an issue of material fact. The employer's witnesses, Schumacher and Dr. Carter, testified that the claimant's jobs were not unusually stressful and that he generated his own stress from his subjective and unrealistic view of the situation because of insecurities arising out of his brain dysfunction and chaotic childhood. McClelland concedes that his job was not unusually stressful, and that responsibility in general is stressful for him.

McClelland relies primarily on his treating psychiatrist's testimony that his depression, more probably than not, "mainly related to his work experience and what had happened there." We are aware that the trier of fact should give "special consideration" to the claimant's treating physician. *Hamilton v. Department of Labor & Indus.*, 111 Wn.2d

569, 761 P.2d 618 (1988).[1] The doctor's opinion does not create an issue of fact here, however, because of the longstanding requirement that there must be objective proof of the relationship between the employment and the occupational disease. *Favor v. Department of Labor & Indus.*, 53 Wn.2d at 704-05. In discussing when a disease arises "naturally" out of employment, the more recent *Dennis* case uses different words but requires the same kind of evidence: "We hold that a worker must establish that his or her occupational disease came about as a matter of course as a natural consequence or incident of *distinctive conditions of his or her particular employment.*" (Italics ours.) 109 Wn.2d at 481. Clearly, that is an objective test, not a license for a claimant to rely solely on his subjective impressions of the conditions at his place of employment. Dr. Rice had only his patient's subjective impressions to go on. We have no doubt that Mr. McClelland suffered depression caused in part by stresses he experienced at work, but those stresses were, unfortunately, self-inflicted and not objectively caused by the work.

The summary judgment in favor of ITT Rayonier is affirmed.

ALEXANDER, J., and SCHUMACHER, J. Pro Tem., concur.

---

[1]We are unsure what the Supreme Court means by "special consideration". *Hamilton* explained that this does not require a jury to "give more weight or credibility to the attending physician's testimony but to give it careful thought." 111 Wn.2d at 572. We assume that the jury gives careful thought to every witness's testimony. If the attending physician's testimony does not carry any more weight or credibility with the jury, how then does the jury give it special consideration?