[No. 67213-4-I. Division One. October 8, 2012.]

THE CITY OF BELLEVUE, *Respondent*, v. MICHAEL A. RAUM,
*Appellant*.

128

*Ronald G. Meyers* (of *Ron Meyers & Associates PLLC*); *Kenneth B. Gorton*; and *L. Zoe Wild* (of *MacColl Busch Sato PC*), for appellant.

*Robert M. McKenna, Attorney General,* and *Beverly N. Goetz, Assistant,* and *Lori M. Riordan, City Attorney,* and *Cheryl A. Zakrzewski, Assistant,* for respondent.

¶1 LAU, J. — RCW 51.32.185 establishes a rebuttable evidentiary presumption that certain diseases suffered by fire fighters are "occupational diseases" as defined by the Industrial Insurance Act (Act), Title 51 RCW. The presumption extends to heart problems experienced within 24 hours of strenuous physical exertion due to fire fighting activities. The presumption "may be rebutted by a preponderance of the evidence." RCW 51.32.185(1). City of Bellevue (City) fire fighter Michael Raum filed a worker's compensation claim after he experienced chest pressure while performing official fire fighter duties. After the Board of Industrial Insurance Appeals (Board) awarded him benefits, the City appealed to superior court. A jury returned a verdict for the City. Raum appeals, arguing that (1) the jury instructions and special verdict form inadequately stated the law, (2) the trial court improperly excluded testimony already in the board record, and (3) insufficient evidence supports the verdict. Because the instructions and special verdict form correctly state the law, the trial court properly excluded inadmissible hearsay testimony, and sufficient evidence supports the verdict, we affirm.

## FACTS

¶2 The City hired Michael Raum as a professional fire fighter in 1991. Throughout 19 years on the job, he was exposed to smoke, chemicals, fumes, and carbon monoxide. Over the course of his career, he was evaluated several times for smoke inhalation at the scene of a fire. He was also exposed to secondhand cigarette smoke at the fire station, though he never smoked as a fire fighter.[1]

¶3 Raum testified that he never experienced chest pain before 2008. That year, he experienced chest pressure on

---

[1] Raum smoked on and off for a 4-year period when he was in high school but had not smoked in more than 25 years at the time of the board hearing in this case.

three occasions while at work.[2] He first experienced chest pressure in February 2008 while using an elliptical machine at high intensity during a fitness training session at the fire station. He lowered the machine's intensity and the pressure sensation subsided. The second time he felt chest pressure, he was using the same elliptical machine at the same location. The pressure ceased when he stopped exercising. The third episode occurred when Raum went on an emergency call involving a car accident. He jumped out of the fire truck and felt chest pressure as he ran to the accident scene. He testified that on this occasion, the pressure "was a little more intense than it had been before" but it subsided after about a minute. Report of Proceedings (RP) (Apr. 20, 2011) at 357.

¶4 Raum applied to the Department of Labor and Industries (Department) for benefits, alleging he sustained an industrial injury to his chest in February 2008. The Department denied Raum's claim on the basis that his condition was not an occupational injury or an occupational disease under the Act. The Department denied Raum's subsequent request for reconsideration. Raum appealed to the Board, arguing that the Department failed to apply RCW 51.32-.185's[3] rebuttable evidentiary presumption.

¶5 Before the board hearing, Raum moved for summary judgment, arguing he was entitled to RCW 51.32.185's evidentiary presumption and that the City failed to rebut the presumption. The Board denied Raum's motion, and the appeal proceeded to a hearing. Each party presented expert testimony regarding whether Raum's heart condition was employment related.

---

[2] The City does not dispute that the three episodes of chest pressure or chest discomfort Raum described occurred while he was working his assigned fire fighter shifts. The City further "does not dispute that Raum experienced chest discomfort or pain that occurred within twenty-four hours of strenuous firefighting activity as such activity is defined by RCW 51.32.185(6)." Resp't's Br. at 17 n.11.

[3] As discussed below, this statute creates a rebuttable evidentiary presumption that certain diseases suffered by fire fighters are occupational diseases under the Act. *See* RCW 51.32.185(1).

¶6 The industrial appeals judge (IAJ) issued a proposed decision and order reversing the Department's decision. The IAJ found:

> The conditions in which Lt. Raum performed his firefighting activities were distinctive conditions of employment that more probably caused his heart problems than conditions in everyday life or all employments in general, including a former history of tobacco use, hypertension, cholesterol, family history, and exposure from other employment or non-employment activities.

Certified Appeal Board Record (CABR) at 49. The IAJ concluded that Raum's heart problems constituted an occupational disease under RCW 51.08.140[4] and it was more probable than not that he suffered heart problems from his fire fighting activities. The City petitioned the Board for review, assigning error to multiple findings of fact and conclusions of law and all adverse evidentiary rulings before the Board. The Board denied review and adopted the proposed decision and order as its own.

¶7 The City appealed to King County Superior Court. Raum moved for summary judgment, arguing that the City presented insufficient evidence to overcome RCW 51.32-.185's statutory presumption. The court denied his motion, and the matter proceeded to a jury trial. Pursuant to RCW 51.52.115, the entire Board record was read to the jury except for testimony the superior court ordered stricken.

¶8 The medical evidence read to the jury at trial established the following:[5] The City presented cardiologist Eu-

---

[4] RCW 51.08.140 defines "occupational disease" as "such disease or infection as arises naturally and proximately out of employment . . . ."

[5] In his opening brief, Raum improperly cites to the deposition and hearing testimony provided to the Board. Because the superior court ruled on various objections, not all of the Board testimony was actually presented during the trial. The City moves to strike all sections of Raum's brief that improperly cite to the Board record because "it is impossible to ascertain if he is citing to testimony that was actually read to the jury or not." Resp't's Mot. to Strike Portions of Appellant's Br. at 4. Because we discuss and analyze the testimony below as it was actually presented to the jury, we deny the City's motion.

gene Yang's deposition testimony. Dr. Yang reviewed Raum's medical records from 2000 to 2009 but never examined Raum. Dr. Yang testified that reviewing records provides a significant amount of information to form an opinion regarding a patient's condition, "including blood pressure, cholesterol levels, blood glucose levels, the patient's body mass index, that can allow us to determine what kind of risk factors that individual has specifically for cardiovascular disease." RP (Apr. 19, 2011) at 73. He stated, "[I]t is not uncommon . . . for [cardiologists] to place a great role on reviewing records in order for us to formulate a diagnosis and opinion regarding [a patient's] specific cardiovascular-related disease or conditions." RP (Apr. 19, 2011) at 73.

¶9 Dr. Yang testified that a July 2001 cardiovascular examination revealed that Raum had high blood pressure; a very high total cholesterol level; and a high LDL (low density lipoprotein), or "bad cholesterol," level. Raum's total cholesterol to HDL (high density lipoprotein), or "good cholesterol," ratio—a predictor of cardiovascular risk—was also high. Raum was prescribed Lipitor in October 2001 to treat his high cholesterol. His cholesterol levels initially improved, but Raum began taking the medication only intermittently and by August 2002 his levels increased again.[6]

¶10 Dr. Yang testified that in September 2003 another medical examination revealed that Raum had "extremely high" total cholesterol and LDL cholesterol levels, "markedly elevated" triglyceride[7] levels, high total cholesterol to HDL ratio, and hypertensive resting blood pressure. According to Dr. Yang, the examination indicated Raum was "at

---

[6] Dr. Yang testified that taking cholesterol medications intermittently may elevate the risk of developing cholesterol buildup in the arteries.

[7] Dr. Yang testified that triglycerides "have been associated as an independent risk factor for heart disease." RP (Apr. 19, 2011) at 87.

high cardiovascular risk" due to his blood tests and other factors such as his weight and blood glucose levels. Raum resumed taking cholesterol-lowering medications. In August 2004 Raum's cholesterol profile showed good LDL cholesterol levels but his triglyceride levels were more than double the acceptable level. His creatine phosphokinase enzyme (CPK) level—an indicator of heart muscle inflammation—was also high.

¶11 In July 2005, another examination revealed that Raum's body mass index was on the borderline between overweight and obese. His total cholesterol level and LDL cholesterol level were extremely high, and his triglycerides were still elevated. A stress test showed "potentially worrisome" changes that led Raum's physician to refer him to cardiologist Rubin Maidan. Dr. Yang testified that based on Dr. Maidan's records from August 2005, Raum reported experiencing multiple episodes of chest pain with exertion and at rest—including at least six occasions where a chest ache lasted up to 10 minutes—as well as shortness of breath with exertion. Dr. Maidan's records indicated that Raum's cholesterol levels were elevated, he would very likely need additional cholesterol-lowering medications in the future, and he might have early coronary artery disease given his family history.

¶12 Dr. Yang next reviewed records from early 2008.[8] At that time, Raum's total cholesterol and triglyceride levels were "extremely high," his LDL cholesterol level was "markedly elevated," and his fasting glucose level was elevated to the extent it was a potential marker of metabolic syndrome—"a known risk factor for cardiovascular disease." RP (Apr. 19, 2011) at 94. A March 2008 coronary angiogram showed that Raum had extensive coronary artery disease. Dr. Yang testified that Raum had calcification of his main artery, a condition that "occurs generally when people have

---

[8] No witness testified about Raum's medical condition from mid-2005 through early 2008, and neither party submitted or reviewed medical records for that time frame.

advanced disease that occurs over many decades." RP (Apr. 19, 2011) at 97. Nine months later, another angiogram indicated Raum had very high grade blockage in a different artery.

¶13 Based on his review of Raum's medical records, Dr. Yang testified that Raum has very severe multivessel coronary artery disease, very severe hyperlipidemia or hypercholesterolemia, mild hypertension, metabolic syndrome, and abdominal obesity, all of which are risk factors for cardiovascular disease. When asked whether Raum experienced a heart problem within 72 hours of exposure to smoke, fumes, or toxic substances or within 24 hours of strenuous physical exertion due to fire fighting activities under RCW 51.32.185, Dr. Yang stated he did not believe, based on the statute's definitions, that the evidence indicated Raum developed a heart problem. Dr. Yang testified that on a more probable than not basis, Raum's risk factors for cardiovascular disease—not his occupational exposures—caused his aggressive coronary artery disease over several decades. Dr. Yang testified that although symptoms of a chronic problem like coronary artery disease can become unmasked during physical exertion, "the actual problem or heart problem is not something that occurred within that 24-hour or 72-hour window." RP (Apr. 19, 2011) at 110. He clarified on cross-examination:

> [C]oronary artery disease is not a heart problem that develops within 24 to 72 hours. That is a very important distinction that needs to be clarified versus somebody who has a heart attack, which certainly in a setting of fire suppression could be a direct manifestation of the occupational exposure.

RP (Apr. 19, 2011) at 175. Finally, when asked to discuss medical studies addressing whether fire fighting is associated with cardiovascular disease, Yang opined, "[W]e don't really have any strong evidence that there is a direct link or causation between firefighting as an occupation and either the development of obstructive coronary artery disease that

Mr. Raum suffers from or even an increased risk of dying from cardiovascular disease." RP (Apr. 19, 2011) at 120-21.

¶14 The City also presented internal medicine physician Alvin Thompson's testimony. Dr. Thompson conducted an independent medical evaluation of Raum in October 2008. At that time, Raum was taking medications to lower his cholesterol, open his blood vessels, and prevent blood clotting. Dr. Thompson reviewed Raum's medical records—including those written by Drs. Maidan, Robert Thompson, Rachel Weiman, and Edward Kim—and performed a physical examination. Dr. Thompson concluded that Raum had coronary disease starting in about 2005. He testified that Raum's cholesterol levels, body mass index, and CPK levels were higher than normal and his blood pressure was at "the upper limits of normal." RP (Apr. 18, 2011) at 61-64, 71. He testified on a more probable than not basis that Raum had dyslipidemia (high blood fat). Dr. Thompson opined that this condition "had nothing to do with [Raum's] employment" because "family history would suggest a genetic basis."[9] RP (Apr. 18, 2011) at 78-79.

¶15 Dr. Thompson also diagnosed Raum with "arteriosclerotic cardiovascular disease with a history of angina, narrowing of two of his three main coronary arteries with stent placement medically unrelated to the subject claim on a more-probable-than-not basis"[10] and "[f]amily history of lethal coronary disease." RP (Apr. 18, 2011) at 80, 82. He agreed with Dr. Yang that Raum has metabolic syndrome.

---

[9] Raum's father died at age 37 "in coronary occlusion, having had rheumatic fever but having smoked a lot." RP (Apr. 18, 2011) at 70. Dr. Thompson saw no autopsy or death certificates for Raum's father but testified that it was more likely Raum's father died of coronary disease than from rheumatic fever because his death was sudden. Raum noted on a patient information form that stroke was in his family history, that his father had high blood pressure or hypertension, his grandmother had congestive heart failure, and his grandmother and brother had diabetes. Raum later qualified these remarks by saying they represented his best guesses at the time he filled out the form.

[10] Regarding angina (pain or pressure sensations resulting from inadequate blood flow through the heart), Dr. Thompson testified that this was a symptom of a condition, not a condition in itself.

Dr. Thompson testified that given Raum's family history and atherosclerotic vascular disease and dyslipidemia, his level of cardiac disease would be the same in 2009 as it would have been in any other employment or if Raum had not worked at all. He stated that Raum would more probably than not have the same degree of dyslipidemia and cardiovascular disease even if he were not employed as a fire fighter. He continued, "It is likely . . . that a major component of [Raum's] coronary disease is genetic, and there is every reason to believe that his coronary disease may progress whether working in a sedentary occupation, as a firefighter, or with any other occupation." RP (Apr. 18, 2011) at 87.

¶16 Raum presented Dr. Maidan's testimony. Dr. Maidan was Raum's treating cardiologist from August 2005 to January 2009. He stated that Raum's health history showed several episodes of chest discomfort. Dr. Maidan noted in his August 2005 records that Raum's "family history was positive for heart attack, hypertension, and sudden death of his father, age 37, stroke in his grandfather, congestive heart failure in his grandmother, diabetes in his grandmother and his brother." RP (Apr. 19, 2011) at 203. He further noted:

> [Raum] has a family history of early heart disease. His father died suddenly at his . . . seven-year-old [brother's] birthday party when he, himself, was five years old. His father was 37 and had a massive heart attack and may have never made it back home, having gone out to get more ice cream for the party.

RP (Apr. 19, 2011) at 205. Dr. Maidan administered a stress test to Raum in August 2005. His notes indicated Raum "may have early coronary artery disease prior to the level that can be detected by a stress test." RP (Apr. 19, 2011) at 209.

¶17 Dr. Maidan saw Raum again in March 2008 and noted severely elevated total cholesterol and LDL cholesterol levels and moderately elevated triglyceride levels. Dr.

Maidan acknowledged that Raum's cholesterol levels gave him "a high-risk profile for developing cardiac disease." RP (Apr. 20, 2011) at 220. Another stress test suggested that Raum had developed clinically significant atherosclerosis since 2005. Dr. Maidan concluded on March 3, 2008, "[T]his patient has chest pressure and ST depression with exercise testing which suggests ischemia . . . . he has significant hyperlipidemia *on a genetic basis that is probably the cause.*" RP (Apr. 20, 2011) at 222 (emphasis added).

¶18 On March 6, 2008, Dr. Maidan performed a coronary catheterization and installed six stents in Raum's coronary arteries. Dr. Maidan found that Raum's left anterior descending artery had a 95 percent stenosis (narrowing) and was highly calcified. Dr. Maidan concluded Raum "was a young individual with very early severe coronary artery disease." RP (Apr. 20, 2011) at 224. He admitted he "cannot tell when in a person's life they first started developing early plaque in their [blood] vessels." RP (Apr. 20, 2011) at 229. He did not know whether Raum was exposed to smoke, fumes, toxic substances, or strenuous physical activity at work in the hours prior to his series of chest discomfort complaints. Dr. Maidan could not say which of the many risk factors caused Raum's heart problems.

¶19 Finally, Dr. Maidan testified that fire fighters "have a higher risk of cardiovascular disease and cardiovascular death than the general population." RP (Apr. 19, 2011) at 193-94. He also testified there was no way to segregate out any particular component of the exposures or stresses a fire fighter encounters from any genetic risk factors with any kind of reasonable medical probability.

¶20 Raum also presented cardiologist Edward Kim's testimony. Dr. Kim first treated Raum in December 2008 for a heart attack that resulted from a clogged artery. He diagnosed Raum with coronary artery disease or "[a]therosclerosis specifically in the coronary arteries." RP (Apr. 20, 2011) at 252. Dr. Kim testified that high blood pressure generally causes this condition and stated that genetics is

the main factor in high blood pressure, but other factors such as obesity, poor diet, excess salt, chronic pain, or chronic stress may contribute. When asked whether factors such as fire alarms, lights, sirens, or wildfires cause high blood pressure, Dr. Kim either did not know or speculated that they might. He opined that Raum's high cholesterol and family history contributed to his atherosclerosis. He also stated that the chest pressure and discomfort Raum experienced were symptoms of an underlying disease, "not a condition in and of themselves." RP (Apr. 20, 2011) at 276. Although Dr. Kim knew nothing specific about Raum's occupational exposures to various toxins or stresses, he opined, "I would imagine that his exposures played a role in his atherosclerosis." RP (Apr. 20, 2011) at 261. But Dr. Kim described his awareness of cardiovascular risk factors that arise out of the fire fighter occupation as "limited." RP (Apr. 20, 2011) at 283. He concluded that it was possible Raum's coronary artery disease would exist no matter what his occupation was or whether he worked at all.

¶21 The jury returned a verdict in the City's favor. Raum appeals.[11]

---

[11] After filing his opening brief, Raum moved to supplement the appellate record with the "Declaration of Ron Meyers." Appellant's Mot. to Supplement R. at 1. In his declaration, Raum's attorney Ron Meyers gives an account of a conversation he had with juror "Debbie S." following the jury verdict. Appellant's Br. Attach. Meyers's declaration states that Debbie S. told him that she and other jurors believed that the jury instructions and special verdict form were confusing and left no alternative but to find for the City. The City moved to strike the declaration and all references to it, arguing that (1) Raum waived his right to challenge the verdict process, (2) Raum's motion fails to meet the criteria for RAP 9.11, (3) the declaration is inadmissible hearsay, and (4) the jury's understanding of the instruction inheres in the verdict.

We grant the City's motion under RAP 9.11, which provides in relevant part, "The appellate court may direct that additional evidence on the merits of the case be taken before the decision of a case on review if: (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide

## ANALYSIS

*Standard of Review*

¶22 A superior court reviews decisions under the Act de novo, relying on the certified board record. RCW 51.52.115; *Elliott v. Dep't of Labor & Indus.*, 151 Wn. App. 442, 445, 213 P.3d 44 (2009). "Only issues of law or fact that were included in the notice of appeal to the Board or in the proceedings before the Board may be raised in the superior court." *Elliott*, 151 Wn. App. at 446. On review to the superior court, the Board's decision is prima facie correct and the burden of proof is on the party challenging the decision, although "[t]he superior court may substitute its own findings and decision for the Board's if it finds, 'from a fair preponderance of credible evidence', that the Board's findings and decisions are incorrect." *McClelland v. ITT Rayonier, Inc.*, 65 Wn. App. 386, 390, 828 P.2d 1138 (1992) (quoting *Weatherspoon v. Dep't of Labor & Indus.*, 55 Wn. App. 439, 440, 777 P.2d 1084 (1989)). "[E]ither party shall be entitled to a trial by jury upon demand" to resolve factual disputes. RCW 51.52.115. "[T]he trier of the fact, be it court or jury, is at liberty to disregard board findings and decision if, notwithstanding the presence of substantial evidence, it is of the opinion that other substantial evidence is more persuasive." *Gaines v. Dep't of Labor & Indus.*, 1 Wn. App. 547, 550, 463 P.2d 269 (1969).

¶23 Our review is governed by RCW 51.52.140, which provides that an "[a]ppeal shall lie from the judgment of the superior court as in other civil cases." "We review whether substantial evidence supports the trial court's factual findings and then review, de novo, whether the trial court's

the case solely on the evidence already taken in the trial court." RAP 9.11(a). Raum fails to argue that he meets these six criteria for supplementing the appellate record but asks us to waive the criteria to "serve the ends of justice." Appellant's Mot. to Supplement R. at 3. Raum's argument is based on the contention that the jury instructions and the special verdict form were confusing and "incorrect as a matter of law." Appellant's Reply to Resp't's Mot. in Opp'n at 1. As discussed below, this argument lacks merit. We grant the City's motion to strike.

conclusions of law flow from the findings." *Watson v. Dep't of Labor & Indus.*, 133 Wn. App. 903, 909, 138 P.3d 177 (2006).

*Occupational Disease and RCW 51.32.185's Rebuttable Evidentiary Presumption*

¶24 RCW 51.08.140 defines "occupational disease" as "such disease or infection as arises naturally and proximately out of employment." The causal connection between a claimant's condition and his employment must be established by competent medical testimony[12] that shows that the condition is probably, not merely possibly, caused by the employment. *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d 467, 477, 745 P.2d 1295 (1987). Our Supreme Court has addressed what is required for a disease to arise "naturally" out of employment:

> We hold that a worker must establish that his or her occupational disease came about as a matter of course as a natural consequence or incident of distinctive conditions of his or her particular employment. The conditions need not be peculiar to, nor unique to, the worker's particular employment. Moreover, the focus is upon conditions giving rise to the occupational disease, or the disease-based disability resulting from work-related aggravation of a nonwork-related disease, and not upon whether the disease itself is common to that particular employment. The worker, in attempting to satisfy the "naturally" requirement, must show that his or her particular work conditions more probably caused his or her disease or disease-based disability than conditions in everyday life or all employments in general; the disease or disease-based disability must be a natural incident of conditions of that worker's particular employment. Finally, the conditions causing the disease or disease-based disability must be conditions of *employment*, that is, conditions of the worker's particular occupation as opposed to conditions coincidentally occurring in his or her workplace.

---

[12] Causation may be established by lay testimony if the injury is apparent to one without medical testimony (e.g., a layman sees his co-worker lose a finger on the job). *See Jackson v. Dep't of Labor & Indus.*, 54 Wn.2d 643, 648, 343 P.2d 1033 (1959).

*Dennis*, 109 Wn.2d at 481. A disease is proximately caused by employment conditions when "there [is] no intervening independent and sufficient cause for the disease, so that the disease would not have been contracted but for the condition existing in the . . . employment." *Simpson Logging Co. v. Dep't of Labor & Indus.*, 32 Wn.2d 472, 479, 202 P.2d 448 (1949).

¶25 RCW 51.32.185(1) contains a burden-shifting provision for fire fighters with occupational disease claims:

> In the case of firefighters . . . there shall exist a prima facie presumption that: (a) Respiratory disease; (b) any heart problems, experienced within seventy-two hours of exposure to smoke, fumes, or toxic substances, or experienced within twenty-four hours of strenuous physical exertion due to firefighting activities; (c) cancer; and (d) infectious diseases are occupational diseases under RCW 51.08.140.

The statute also contains a rebuttal provision: "This presumption of occupational disease may be rebutted by a preponderance of the evidence. Such evidence may include, but is not limited to, use of tobacco products, physical fitness and weight, lifestyle, hereditary factors, and exposure from other employment or nonemployment activities." RCW 51.32.185(1).

¶26 Generally a worker claiming entitlement to benefits for an occupational disease carries the burden of proving that the disabling condition arose naturally and proximately out of employment. *Ruse v. Dep't of Labor & Indus.*, 138 Wn.2d 1, 6, 977 P.2d 570 (1999). If RCW 51.32.185's rebuttable evidentiary presumption applies, that burden shifts to the employer unless and until the employer rebuts the presumption.

### *Jury Instruction 14*

¶27 Raum claims that instruction 14 improperly negated the evidentiary presumption set forth in instruction 13. The City responds that (1) Raum waived this argument by

failing to raise it below, (2) Raum waived his right to claim error because he offered instruction 14, and (3) instruction 14 is a correct statement of the law.

¶28 Although Raum proposed instruction 14, he took exception to it in light of instruction 13 and the special verdict form. Raum properly preserved his argument for appellate review. *Wickswat v. Safeco Ins. Co.*, 78 Wn. App. 958, 967, 904 P.2d 767 (1995) (an appellate court may review "a claimed instructional error when the party has properly excepted pursuant to CR 51(f)").

¶29 Jury instructions are sufficient if they (1) allow each party to argue its theory of the case, (2) are not misleading, and (3) when read as a whole, properly inform the trier of fact of the applicable law. *Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters*, 107 Wn.2d 524, 529, 730 P.2d 1299 (1987). We review the adequacy of jury instructions de novo as a question of law. *Hall v. Sacred Heart Med. Ctr.*, 100 Wn. App. 53, 61, 995 P.2d 621 (2000). "[A]n instruction that contains an erroneous statement of the applicable law is reversible error where it prejudices a party." *Cox v. Spangler*, 141 Wn.2d 431, 442, 5 P.3d 1265, 22 P.3d 791 (2000).

¶30 Here, instruction 13 provided:

> A statute provides that heart problems experienced by a firefighter within twenty-four hours of strenuous physical exertion due to firefighting activities are presumed to be an occupational disease. This presumption of occupation disease may be rebutted by a preponderance of the evidence. Such evidence may include, but is not limited to, use of tobacco products, physical fitness and weight, lifestyle, hereditary factors, and exposure from other employment or non-employment activities.

This instruction mirrors the evidentiary presumption set forth in RCW 51.32.185(1).

¶31 Instruction 14 provided:

> An occupational disease is defined by law as:

. . . such disease or infection as arises naturally and proximately out of the employment.

The fact that a worker contracts a disease while employed does not mean it is an occupational disease. To establish that a disease is occupational, the worker must prove that it arose naturally and proximately out of employment.

A disease arises naturally out of employment if the disease is a natural incident or consequence of distinctive conditions of a worker's particular employment as opposed to conditions coincidentally occurring in a worker's workplace. A disease does not arise naturally out of employment if it is caused by conditions of everyday life or all employments in general.

A disease arises proximately out of employment if the conditions of a worker's employment proximately caused or aggravated the worker's disease.

This instruction is taken from RCW 51.08.140 and *Dennis*, 109 Wn.2d at 481.

¶32 Raum acknowledges that instructions 13 and 14 are correct statements of law. But Raum claims the instructions are confusing when read *together* because they do not make clear that he "could have an RCW 51.32.185 claim and/or an RCW 51.08.140 claim. . . ." Appellant's Reply Br. at 14 (boldface omitted). His argument depends on the proposition that RCW 51.08.140 and RCW 51.32.185 establish two different claims for occupational disease.

¶33 Throughout his brief, Raum refers to a "presumptive disease claim" and seems to argue that RCW 51.32.185 creates an occupational disease claim somehow different from RCW 51.08.140's "standard occupational disease claim." Appellant's Br. at 25. We disagree. RCW 51.32.185(1) creates no new cause of action—it establishes a *"presumption"* that applies to certain fire fighter occupational disease claims. The Engrossed Substitute Senate Bill (ESSB) 5801 Fact Sheet (1987) explained, "[The] Bill *does nothing more than shift the burden of proof* for duty related heart disease for LEOFF [Law Enforcement Officers' and Fire Fighters' Retirement System] II law enforcement, and

heart/lung diseases for fire fighters to [the Department] or self-insured employers." (Emphasis added.) The House Bill Report, Senate Bill Report, and Final Legislative Report all contain language echoing the statutory language: "A rebuttable *presumption* is established . . ."; "There is a rebuttable *presumption* . . ."; "The *presumption* may be rebutted . . . ." H.B. Rep. on ESSB 5801, 50th Leg., Reg. Sess. (Wash. 1987); S.B. Rep. on S.B. 5801, 50th Leg., Reg. Sess. (Wash. 1987); Final Legislative Report, 50th Leg., at 285 (Wash. 1987) (emphasis added). RCW 51.32.185 does nothing more than create a rebuttable evidentiary presumption. We conclude the statute creates no occupational disease claim different from that defined in RCW 51.08.140.

¶34 The jury instructions quoted above accurately stated the law. They allowed Raum to argue that he was entitled to RCW 51.32.185's evidentiary presumption and that the City failed to rebut the presumption. They also allowed Raum, if he did not qualify for the presumption, to present evidence that his heart condition arose naturally and proximately from his employment. We reject Raum's claim of error because it is based on a mischaracterization of RCW 51.32.185's evidentiary presumption.

*Special Verdict Form*

¶35 Raum argues that the special verdict form submitted to the jury constitutes reversible error because (1) "it attempt[ed] to incorrectly combine the presumptive statute with the standard occupational disease statute" and (2) it improperly failed to list "aggravation" of a preexisting disease in question 2 as a means through which he was entitled to benefits. Appellant's Br. at 27, 30 (boldface omitted). The City responds that (1) Raum waived his challenge to the special verdict form when he failed to provide a legally sufficient alternative special verdict form and (2) the form correctly stated the law.

¶36 Regarding the City's waiver argument, the rules for properly objecting to special verdict forms are, by

analogy, governed by CR 51(f),[13] which governs jury instructions. *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 63, 882 P.2d 703, 891 P.2d 718 (1994). If a party is dissatisfied with a special verdict form, then that party has a duty to propose an appropriate alternative. *Wickswat*, 78 Wn. App. at 966-67. The City claims that Raum waived his challenge to the special verdict form by failing to provide a legally sufficient alternative special verdict form. But an appellate court may still review a claimed special verdict form error when the party has properly excepted by " 'stat[ing] distinctly the matter to which he objects and the grounds of his objection.' " *Wickswat*, 78 Wn. App. at 967 (alteration in original) (internal quotation marks omitted) (quoting *Queen City*, 126 Wn.2d at 63)). Here, the record reveals that Raum objected to the special verdict form on the ground that it improperly combined two distinct theories of recovery.[14] We thus review the claimed error. *Wickswat*, 78 Wn. App. at 967.

¶37 A special verdict form is sufficient if it allows the parties to argue their theories of the case, does not mislead the jury, and properly informs the jury of the law to be applied. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995). Here the superior court submitted the following special verdict form to the jury:

QUESTION NO.1: Was the Board of Industrial Insurance Appeals correct in deciding that on February 17, 2008 Michael Raum experienced heart problems within twenty-four hours of strenuous physical exertion due to firefighting activities and

---

[13] CR 51(f) provides, "Before instructing the jury, the court shall supply counsel with copies of its proposed instructions which shall be numbered. Counsel shall then be afforded an opportunity in the absence of the jury to make objections to the giving of any instruction and to the refusal to give a requested instruction. The objector shall state distinctly the matter to which he objects and the grounds of his objection, specifying the number, paragraph or particular part of the instruction to be given or refused and to which objection is made."

[14] After repeatedly arguing that the court had erroneously combined RCW 51.32.185 and RCW 51.08.140 into one theory of recovery, Raum's attorney objected to the special verdict form, stating, "I have put my comments on the record with respect to the law." RP (Apr. 21, 2011) at 411.

which arose naturally and proximately from the distinctive conditions of his employment as a firefighter?

ANSWER: ___ ("Yes" or "No")

QUESTION NO.2: Was the Board of Industrial Insurance Appeals correct in its determination that Michael Raum's heart condition is an occupational disease that arose naturally and proximately from the distinctive conditions of his employment as a firefighter?

ANSWER: ___ ("Yes" or "No")

The jury answered "no" to both questions.

¶38 Raum first argues that the special verdict form improperly created a "hybrid" of RCW 51.32.185 and RCW 51.08.140 and thus denied him the opportunity to recover on two separate theories. This argument depends on the same proposition Raum argued in challenging instruction 14, namely that RCW 51.32.185 created a "presumptive disease claim" somehow different from an "occupational disease claim" as defined in RCW 51.08.140. To the extent Raum bases his challenge to the special verdict form on this particular argument, it lacks merit as discussed above. Here, the special verdict form contained no clear misstatement of the law that could have prejudicially misled the jury. Instructions 13 and 14 correctly described occupational disease claims and the evidentiary presumption. The special verdict form's question 1 allowed the jury to consider whether the evidentiary presumption applied. Question 2 allowed the jury—in the event it found that Raum did not qualify for the presumption or the City rebutted the presumption—to consider whether Raum nevertheless presented sufficient evidence to establish an occupational disease under RCW 51.08.140.

¶39 Raum specifically challenges the "and which arose naturally and proximately from the distinctive conditions of his employment as a firefighter" language in the special verdict's question 1. He claims that in enacting RCW 51.32.185's evidentiary presumption, "[t]he legislature has

done away with the 'naturally and proximately' require-
ment for firefighter presumptive disease claims." Appel-
lant's Br. at 29. We disagree. RCW 51.32.185 does not
establish a separate "presumptive disease claim." And RCW
51.32.185's presumption eliminates only the requirement
that Raum present competent medical evidence *at the
outset* to show that his heart condition is related to his fire
fighting duties and thus an occupational disease. If the City
rebuts the presumption, Raum must come forward with
competent evidence supporting his occupational disease
claim.[15] The "naturally and proximately" language is part of
RCW 51.08.140's definition of "occupational disease," which
is referenced in RCW 51.32.185. Where, as here, the oppos-
ing party presents countervailing evidence to rebut the
presumption, the above language is appropriately included
in the special verdict form. Raum's challenge fails.

 ¶40 Raum also challenges the special verdict form
on the ground that it improperly failed to provide for the
possibility that he had a preexisting condition that was
"aggravated by" his employment. Raum cites no authority
for the proposition that legal standards must be included in
special verdict forms. *Cowiche Canyon Conservancy v.
Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (declining
to consider arguments unsupported by reference to the
record or citation to authority). And Raum did not object to
the special verdict form on this ground.

---

[15] The superior court properly analyzed the effect of RCW 51.32.185's
presumption:

> [T]he way I read this is, you've got a liability scheme. And then on top of the
> liability scheme you've got this extra little edge that your client gets. But the
> extra edge is just a presumption. It doesn't change the underlying liability. It
> just means that for starting out, all you have to show is X and Y and then Z is
> presumed. *But I don't think that it eliminates your requirement once there's
> countervailing evidence, which there is in this case, that you still have to prove
> the underlying liability.*

RP (Apr. 21, 2011) at 408 (emphasis added).

His own proposed special verdict form[16] did not contain the "aggravated by" language that he now claims was improperly omitted. Because Raum invited any claimed error, he cannot now complain about the trial court's failure to include the language at issue. *See Estate of Stalkup v. Vancouver Clinic, Inc.*, 145 Wn. App. 572, 584, 187 P.3d 291 (2008) (party may not move for a new trial claiming a deficiency in a special verdict form it had expressly requested); *Sdorra v. Dickinson*, 80 Wn. App. 695, 702-03, 910 P.2d 1328 (1996) (because plaintiffs submitted the verdict form at issue, the plaintiffs invited the error and could not complain on a motion for new trial or on appeal that the verdict forms were inconsistent).

¶41 Even on the merits, "a special verdict form need not recite each and every legal element necessary to a particular cause of action where there is an accurate accompanying instruction." *Capers v. Bon Marche*, 91 Wn. App. 138, 144, 955 P.2d 822 (1998). Here, instruction 14 provided, "A disease arises proximately out of employment if the conditions of a worker's employment proximately caused *or aggravated* the worker's disease." (Emphasis added.) Raum's counsel specifically referenced instruction 14's "aggravation" component during closing remarks. We presume jurors follow the court's instructions. *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 136, 875

---

[16] Raum's proposed special verdict form provided:

QUESTION NO. 1: Was the Board of Industrial Insurance Appeals correct in deciding that on February 17, 2008 Michael Raum suffered from heart problems experienced within twenty-four hours of strenuous physical exertion due to firefighting activities within the meaning of RCW 51.32.185?
ANSWER: ___ ("Yes" or "No")

QUESTION NO. 2: Was the Board of Industrial Insurance Appeals correct in deciding that it was more probable than not that Michael Raum suffered heart problems as an occupational disease from work activity as a firefighter for the City of Bellevue, within the meaning of RCW 51.32.185 and RCW 51.08.140?
ANSWER: ___ ("Yes" or "No")

QUESTION NO. 3: Was the Board of Industrial Insurance Appeals correct in deciding that Michael Raum's heart problems constitute an occupational disease within the meaning of RCW 51.08.140?
ANSWER: ___ ("Yes" or "No")

P.2d 621 (1994). Raum cites to nothing in the record indicating the jury failed to do so in this case. His challenge fails.

*Evidentiary Rulings*

¶42 Raum challenges three of the superior court's evidentiary rulings.[17] Raum claims that the court erred in excluding exhibit 1[18] and certain testimony provided by his wife, Kristy.[19] But because Raum provides no meaningful legal analysis and cites no authority to support his arguments, we can decline to review them. *See Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) (declining to consider an inadequately briefed argument); *Cowiche*, 118 Wn.2d at 809 (declining to consider arguments unsupported by reference to the record or citation to authority).

¶43 Even if we address Raum's claims, they fail on the merits. "A trial court has broad discretion in ruling on evidentiary matters and will not be overturned absent manifest abuse of discretion." *Sintra, Inc. v. City of Seattle*, 131 Wn.2d 640, 662-63, 935 P.2d 555 (1997). Here, the trial court excluded exhibit 1 and all references to it on hearsay and relevancy grounds.[20] " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is inadmissible unless a specific exception applies. ER 802. The trial court properly determined that exhibit 1 constitutes inadmissible

---

[17] Raum cites to nine sections of the Board record that he claims the superior court mistakenly excluded in the challenged evidentiary rulings.

[18] Exhibit 1 is a document that Raum created estimating the number and types of calls and alarms he responded to and the number and types of experiences and exposures he had during his career as a fire fighter.

[19] For clarity, we use Kristy's first name.

[20] Neither party's brief addresses the trial court's exclusion of exhibit 1 on relevancy grounds. Because we find that hearsay was a sufficient basis for the trial court's ruling, we need not address this issue. This evidence was also cumulative of Raum's testimony.

hearsay because Raum offered it to prove the truth of the matter asserted—that he had been exposed to various toxins and stress while employed as a fire fighter. Because Raum identified no hearsay exception at trial or on appeal, we assume none applies. *See State v. Duran-Davila*, 77 Wn. App. 701, 704, 892 P.2d 1125 (1995). The trial court did not abuse its discretion by excluding exhibit 1 and all references to it.[21]

¶44 The trial court also excluded as hearsay certain testimony provided by Kristy. First, Kristy stated that Raum came home from work on one occasion and told her that his clothes had chemicals on them from "being on a call" and should be separated from their baby's clothes in the wash. CABR, Kristy Raum Tr. at 25. Second, Kristy recounted occasions when Raum told her stories about tragedies he witnessed at work. Both responses were hearsay as they attributed out-of-court statements to Raum and were used to prove the truth of the matter asserted—that Raum was exposed to toxins and stress through his work. Because Raum fails to suggest any hearsay exception on appeal,[22] we assume none applies. *See Duran-Davila*, 77 Wn. App. at 704. The trial court did not abuse its discretion when it excluded Kristy's testimony attributing statements to Raum.

---

[21] Even if we concluded the superior court abused its discretion in excluding exhibit 1, the exclusion did not prejudice Raum. Raum testified extensively about his personal experiences and exposures as a fire fighter. And Raum presented no medical evidence relating the incidents documented in exhibit 1 to his coronary artery disease.

[22] At trial, Raum argued that Kristy's testimony that Raum asked her to separate his work clothes from their baby's in the wash was admissible under the present sense impression exception to the hearsay rule. A "present sense impression" is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." ER 803(a)(1). Our review of the testimony indicates that the exception does not apply here.

*Sufficiency of the Evidence*[23]

¶45 Raum contends that insufficient evidence supports the jury's verdict. The State responds that medical testimony established that Raum had multiple, non-employment-related risk factors for heart disease.

¶46 As discussed above, our " 'review is limited to examination of the record to see whether substantial evidence supports the findings made after the superior court's de novo review, and whether the court's conclusions of law flow from the findings.' " *Ruse v. Dep't of Labor & Indus.*, 138 Wn.2d 1, 5, 977 P.2d 570 (1999) (quoting *Young v. Dep't of Labor & Indus.*, 81 Wn. App. 123, 128, 913 P.2d 402 (1996)). "[E]ven if the [appellate] court were convinced that a wrong verdict had been rendered, it should not substitute its judgment for that of the jury so long as there was evidence which, if believed, would support the verdict rendered." *Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 943, 640 P.2d 1051 (1982). More extensive appellate review of facts found in the superior court abridges the right to jury trial provided by RCW 51.52.115:

> Our function is to review for sufficient or substantial evidence, taking the record in the light most favorable to the party who prevailed in superior court. We are not to reweigh or rebalance the competing testimony and inferences, or to apply anew the burden of persuasion, for doing that would abridge the right to trial by jury.

*Harrison Mem'l Hosp. v. Gagnon*, 110 Wn. App. 475, 485, 40 P.3d 1221 (2002) (footnote omitted). In appeals from board

---

[23] Raum bases his sufficiency of the evidence argument in part on the proposition that the Act creates both a "presumptive disease claim" and a "standard occupational disease claim." He again claims that the jury instructions and special verdict wrongly stated the law, "fail[ed] to explain that the presumptive standard is very different," and made it impossible for the jury to understand how to apply the law to the evidence. Appellant's Br. at 34 (boldface omitted). We address those arguments above. To the extent his sufficiency of the evidence argument relies on those premises, it lacks merit.

decisions and orders, "the trier of the fact, be it court or jury, is at liberty to disregard board findings and decision if, notwithstanding the presence of substantial evidence, it is of the opinion that other substantial evidence is more persuasive." *Gaines*, 1 Wn. App. at 550.

¶47 As discussed above, RCW 51.32.185's presumption is not conclusive and may be rebutted by a "preponderance of the evidence." RCW 51.32.185(1). If the employer rebuts the presumption, the burden of proof returns to the worker to show he is entitled to benefits, i.e., that he suffers from an "occupational disease" as defined in RCW 51.08.140. If both parties present competent medical testimony, the jury must weigh the evidence to determine whether the worker's condition "arises naturally and proximately out of employment." RCW 51.08.140. Here, the jury was properly instructed that this was a worker's compensation claim, that special consideration should be given to the testimony of an attending physician, that a condition may have one or more proximate causes, that the Board's findings and conclusions were prima facie correct, and that it was the City's burden to establish by a preponderance of the evidence that the Board's decision was incorrect.

¶48 Raum asserts that the City cannot rebut the presumption simply by criticizing the medical literature discussing the possibility of a connection between coronary artery disease and fire fighting activity. He cites to several foreign cases involving different statutory schemes and presumptions. Those cases are not controlling here. And in 2007 when our legislature added a presumption for "heart problems . . . experienced within twenty-four hours of strenuous physical exertion due to firefighting activities," RCW 51.32.185(1), our governor vetoed the portion of the proposed amendments that sought to include the statement that "[f]irefighting duties exacerbate and increase the incidence of cardiovascular disease in firefighters." LAWS OF 2007, ch. 490, § 1. According to the veto,

[t]he legislature's statement of intent [regarding fire fighting duties and cardiovascular disease] makes broad generalizations about the incidence of cardiovascular disease. In an effort to avoid the unintended interpretations of broad generalizations, Section 2 of the bill has been carefully crafted to define specific "firefighting activities" that are related to occupational diseases.

LAWS OF 2007, ch. 490, veto statement at 2256. amending RCW 51.32.185; Note, governor's partial veto (located at Resp't's Br. App. D). Thus, as enacted and later amended, the presumption was not intended to create a legal conclusion that fire fighters have a higher incidence of *cardiovascular disease*. And regardless of Raum's assertions regarding the medical literature, the City rebutted the presumption with concrete medical testimony that specific factors other than employment—including genetic predisposition, high blood pressure, and high cholesterol—caused Raum's coronary artery disease. This preponderance of evidence indicating that Raum's heart problem arose from conditions unrelated to his fire fighter work shifted the burden to Raum to show that his heart disease arose naturally and proximately from employment.[24]

¶49 This record contains substantial evidence from which the jury could conclude that Raum's heart problems arose from non-employment-related factors. As discussed above, four doctors testified about the nature and cause of Raum's coronary artery disease. The testimony established

---

[24] Raum cites several foreign cases, claiming that "[o]ther jurisdictions have entered strong, well-reasoned presumptive disease rulings in favor of public servants in similar cases." Appellant's Br. at 41 (boldface omitted). He essentially argues that those cases stand for the proposition that when courts apply presumption statutes like RCW 51.32.185, the employer has the burden to prove that the claimant's disease is non-work-related. Appellant's Br. at 41-43; *Robertson v. N.D. Workers Comp. Bureau*, 2000 ND 167, 616 N.W.2d 844, 853; *Montgomery County v. Pirrone*, 109 Md. App. 201, 213, 674 A.2d 98 (1996); *McCoy v. City of Shreveport Fire Dep't*, 26,181 (La. App. 2 Cir. 01/25/95), 649 So. 2d 103; *Fairfax County Fire & Rescue Dep't v. Mitchell*, 14 Va. App. 1033, 1035, 421 S.E.2d 668 (1992). The same rule applies in Washington. *See* RCW 51.32.185(1). But here, the City rebutted the presumption and presented sufficient evidence for the jury to rule in its favor. Raum's cited cases are therefore unhelpful.

that Raum had multiple risk factors unrelated to his employment as a fire fighter. Dr. Yang testified that more probably than not, Raum's cardiovascular disease was unrelated to his occupational exposures and that a variety of non-employment-related factors contributed to his cardiovascular disease. Although Dr. Yang never physically examined Raum,[25] he is a qualified cardiologist and reviewed Raum's medical records before framing an opinion in terms of medical probability. His testimony was sufficient to persuade a fair-minded, rational person to agree with his conclusion. The jury also heard Dr. Thompson's testimony—based on his examination of Raum and review of Raum's medical records—that neither Raum's dyslipidemia nor his cardiovascular disease was proximately caused by his employment. Dr. Thompson also testified on a more probable than not basis that Raum's cardiovascular disease was related to high cholesterol and family history, not to his work as a fire fighter.

¶50 Raum's two attending physicians also provided medical evidence from which the jury could conclude that Raum's heart problems were unrelated to his employment. Dr. Maidan testified that Raum was a young man with very early coronary artery disease caused by high cholesterol, high blood pressure, and family history. Despite offering opinions about fire fighters in general, Dr. Maidan provided no testimony specifically linking Raum's cardiovascular disease to his occupation as a fire fighter. Dr. Kim specifically testified that Raum's high cholesterol and family history contributed to his coronary artery disease. Dr. Kim was unable to testify on a more probable than not basis that Raum's heart problems were related to his exposures to stress or toxins.[26]

---

[25] The weight, if any, to be given a medical expert's opinion based solely on a medical records review is within the jury's province.

[26] Medical testimony proffered to establish the causal relationship between an industrial injury and an alleged condition or disability must be phrased in terms of medical probability, not possibility. Testimony as to possibility means testimony

¶51 Given the above testimony, a preponderance of substantial evidence supports the jury's verdict that Raum's cardiovascular disease arose from risk factors unrelated to his employment as a fire fighter. Raum presented no compelling evidence to support his claim to the contrary. He attempted to draw a connection based on references to medical studies and articles, but no testimony established a clear link between fire fighting and coronary artery disease. Raum's claim turned on how the jury resolved the competing testimony and inferences. And we do not reweigh or rebalance competing testimony and inferences. *Gagnon*, 110 Wn. App. at 485. Substantial evidence existed to rebut the evidentiary presumption and indicated that Raum's condition was unrelated to his employment as a fire fighter.[27] Accordingly, "there was evidence which, if believed, would support the verdict rendered." *Retail Clerks*, 96 Wn.2d at 943.[28]

---

confined to words of speculation and conjecture. Medical testimony that an incident could cause, might cause, or possibly could cause such a condition is not sufficient. *See Vanderhoff v. Fitzgerald*, 72 Wn.2d 103, 107-08, 431 P.2d 969 (1967).

[27] Raum cites several foreign cases for the proposition that "[c]ase law applying the presumptive disease statute require more than just speculation by the employer's experts to overcome its burden of proof." Appellant's Br. at 31 (boldface omitted). He essentially asks us to reweigh the competing testimony and inferences elicited at trial, which we cannot do.

[28] Raum makes two arguments related to his sufficiency of the evidence argument. He first argues that the Act is remedial in nature and must be liberally construed with all doubts resolved in favor of the worker. It is true that we resolve doubts in favor of the worker when *construing* the Act. *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d 467, 470, 745 P.2d 1295 (1987). But we are not construing the Act when we review the sufficiency of the evidence to support the jury's verdict. And even if we were, " 'it is fundamental that, when the intent of the legislature is clear from a reading of a statute, there is no room for construction.' " *Elliott*, 151 Wn. App. at 450 (quoting *Johnson v. Dep't of Labor & Indus.*, 33 Wn.2d 399, 402, 205 P.2d 896 (1949)); *see also Lowry v. Dep't of Labor & Indus.*, 21 Wn.2d 538, 542, 151 P.2d 822 (1944) (declining to apply the liberal construction rule in a workers' compensation case where statutory language was unambiguous and noting that such "so-called construction would, in fact, be legislation"). Here the statutory language unambiguously provides that RCW 51.32.185's evidentiary presumption applies to *some* fire fighter occupational disease claims. The presumption does not create a separate claim for relief. "[W]e cannot, under the guise of construction, substitute our view for that of the Legislature." *Allan v. Dep't of Labor & Indus.*,

*Attorney Fees and Costs*

 ¶52 Raum requests attorney fees and costs on appeal under RCW 51.32.185(7) and RCW 51.52.140. Under RCW 51.32.185(7)(b), a fire fighter successfully appealing a determination regarding the evidentiary presumption shall have his reasonable attorney fees and costs paid by the opposing party. Because Raum has not successfully appealed the trial court's determination, he is not entitled to an award of fees and costs.

## CONCLUSION

¶53 Because (1) Raum fails to show the jury instructions and special verdict form were erroneous, (2) his evidentiary challenges lack merit, and (3) substantial evidence supports the jury's verdict, we affirm.

BECKER and COX, JJ., concur.

Review denied at 176 Wn.2d 1024 (2013).

---

66 Wn. App. 415, 421, 832 P.2d 489 (1992). The liberal construction doctrine is inapplicable.

Raum also argues that we should overturn the jury's verdict as a matter of public policy due to the Act's remedial purpose. But as discussed above, the statutory language here is unambiguous. "It is a well-settled rule that 'so long as the language used is unambiguous a departure from its natural meaning is not justified by any consideration of its consequences, or of public policy.' " *DeLong v. Parmelee*, 157 Wn. App. 119, 146, 236 P.3d 936 (2010) (internal quotation marks omitted) (quoting *State v. Miller*, 72 Wash. 154, 158, 129 P. 1100 (1913)). Courts "should resist the temptation to rewrite an unambiguous statute to suit our notions of what is good public policy, recognizing the principle 'that the drafting of a statute is a legislative, not a judicial, function.' " *Sedlacek v. Hillis*, 145 Wn.2d 379, 390, 36 P.3d 1014 (2001) (internal quotation marks omitted) (quoting *State v. Jackson*, 137 Wn.2d 712, 725, 976 P.2d 1229 (1999)). Departure from the statute or the jury's verdict is improper here.