IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE OF WASHINGTON,<br><br>    Respondent,<br><br>    v.<br><br>JOHN L. DOUGLAS, JR.,<br><br>    Appellant. | No. 85945-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — John L. Douglas, Jr. appeals the decision from the superior court affirming his denial of benefits under the Industrial Insurance Act (IIA), Title 51 RCW, for an occupational disease. He challenges both the trial court's refusal to give a proposed jury instruction concerning the "compensable consequences" doctrine and the court's decision to use the verdict form proposed by the Department of Labor & Industries (Department). Finding no error, we affirm and deny Douglas's request for fees.

FACTS

John L. Douglas worked for over 40 years predominantly in physically demanding jobs. He has a congenital condition that affects skeletal development, and, as a result, he does not have a clavicle.[1] Around July 2015, while working

---

[1] The condition, cleidocranial dysostosis, affects skeletal development, and sometimes contributes to an abnormality in how the clavicle develops.

for Enservio as an on-site specialist,[2] a box of waterlogged books fell onto his outstretched right arm and injured his right shoulder. Douglas subsequently filed a workers' compensation claim for that injury, and the Department allowed the claim and corresponding treatment. After Douglas received treatment, his condition improved and he returned to his job of injury without physical limitations. On October 28, 2015, the claim was closed without an award for permanent disability.

On June 7, 2016, Douglas left Enservio because he could no longer comfortably perform the physical demands of his job due to ongoing right shoulder pain. He then went to work for one of his previous employers to do less physically demanding work. About a year after leaving Enservio, he reinjured his right shoulder outside of work. While reaching into the backseat of his car to grab a bottle of water, he felt a "pop" in his right shoulder. Douglas applied to reopen his June 2015 injury claim. The Department denied the request, and the Board dismissed Douglas's appeal. No further appeal followed.

In May 2019, Douglas saw an occupational medicine physician, Dr. Esi Nkyekyer, who diagnosed him with five conditions related to his right shoulder. Upon Dr. Nkyekyer's recommendation and with her assistance, he filed a claim asserting an occupational disease. The Department denied the claim, stating that Douglas's condition was "not an occupational disease as contemplated by section 51.08.140 RCW." Douglas appealed to the Board of Industrial Insurance

---

[2] Douglas's job entailed entering commercial and residential buildings that experienced a fire or flood and inventorying items not attached to the building itself.

Appeals (Board), and the Board affirmed the Department's order. Pertinent to this appeal, the industrial appeals judge (IAJ) made the following finding:

> Mr. Douglas's conditions diagnosed as right shoulder glenohumeral osteoarthritis; degenerative right labral tear, atrophy of the right rotator cuff, disarticulation of the long head biceps tendon of the right arm/shoulder and right shoulder strain did not arise naturally and proximately out of the distinctive conditions of his employment.

Accordingly, the IAJ concluded, "Douglas's condition is not an occupational disease within the meaning of RCW 51.08.140." Douglas filed a petition for review, which the Board denied.

Douglas then appealed the decision to King County Superior Court, which held a jury trial. After the parties rested, they met with the trial judge to discuss and finalize jury instructions. While the parties agreed on most of the instructions, the trial court declined to offer Douglas's proposed instruction on the doctrine of compensable consequences, which stated as follows:

> The Industrial Insurance Act compensates for any condition from primary industrial injury; or, in other words, it rejects no element of disability if it has accrued in consequence of the first hurt, or as an aggravation arising from any collateral contributing cause. However, the test for determining when an alleged consequential, and therefore compensable, injury exists remains whether there is a proximate cause between the original industrial injury and the impairment or need for medical treatment that is alleged to have arisen in some consequence thereof.[3]

The parties also disagreed about whether to use the Department's proposed verdict form, which posed six questions to the jury. Question 1 asked

---

[3] This instruction cited to four cases, two of which were decisions from the Board of Industrial Insurance Appeals: Ross v. Erickson Constr. Co., 89 Wash. 634, 155 P. 153 (1916); McDougle v. Dep't of Labor & Indus., 64 Wn.2d 640, 644, 393 P.2d 631 (1964); In re: Iris Vandorn, BIIA Dec. 02 11466 (2003); In re: Arvid Anderson, BIIA Dec. 65 170 (1960).

the jury to determine whether the Board's finding of fact number 5 was correct, and it included a verbatim recitation of the finding below:

> **QUESTION 1:** Was the Board of Industrial Insurance Appeals correct in deciding that: Mr. Douglas' conditions diagnosed as right shoulder glenohumeral osteoarthritis, degenerative right labral tear, atrophy of the right rotator cuff, disarticulation of the long head biceps tendon of the right arm/shoulder, and right shoulder strain did not arise naturally and proximately out of the distinctive conditions of his employment?
>
> **ANSWER:** __ (Write "yes" or "no")

Questions 2 through 6 asked if each of the 5 conditions identified in Question 1 individually arose naturally and proximately out of the distinctive conditions of Douglas's employment. Douglas did not agree to including the discrete conditions separately and argued that the first question should ask simply whether he had a claim for an occupational disease. The Department objected to the suggested change, arguing "[i]t's Mr. Douglas's burden to show that the findings and decisions of the Board are incorrect." The trial court decided to use the Department's proposed verdict form.

After deliberations began, the jury asked the trial court two questions. First, the jury asked whether they had "to consider and agree on all of the conditions as a group on Question 1?" The trial court and parties agreed on the response: "Ten (10) jurors must agree to each question. It need not be that the same ten (10) jurors agree to any individual question so long as ten (10) agree to each question." The jury also asked a second question:

> The existence of questions 2-6 have led to some confusion about how to read question # 1. Are we to read question 1 as if the 5 conditions/ailments go together as a group and must be read as a whole - in other words, is the question "Did the Board find correctly

that one or more of the following conditions was NOT an occupational disease?" Or is the question, "Did the Board find correctly that none of these five conditions is an occupational disease?"

In response, the trial court initially suggested providing a new verdict form that stated only Question 1 and omitted Questions 2 through 6. When prompted to comment on this suggestion, Douglas reiterated his position that the first question should just be very simple, but did not immediately specify in what way. The Department argued the jury should simply be instructed to reread the instructions carefully. Eventually, Douglas suggested the first question "should read as whether there was an occupational disease claim." The court proposed the response, "Please reread question one carefully." Douglas objected to this proposal, arguing this solution did not answer the jury's question. The trial court rejected Douglas's proposal and instead gave its proposed response.

After receiving the court's response, the jury asked no further questions and returned a verdict approximately one hour later. The verdict form answered "yes" to Question 1. Because the form instructed the jury, "If you answered 'yes' to Question 1, do not answer any further questions," the jury did not answer Questions 2 through 6. The court then polled the jury; eleven jurors confirmed that was their individual verdict and all twelve jurors confirmed that the verdict was the verdict of the jury. Accordingly, the trial court entered judgment for the Department.

Douglas filed a timely appeal.

DISCUSSION

Douglas asserts the trial court erred when it refused to provide his proposed jury instruction on the compensable consequences doctrine because it was relevant to his occupational disease claim and it was a correct statement of law. He further contends the trial court erred when it overruled his objection to the verdict form and refused to adjust it, especially after the jury asked two clarifying questions concerning the form.

Under the IIA, workers injured on the job are entitled to compensation for their injuries. RCW 51.32.010. The IIA includes coverage for the proximate effects of "industrial injuries" and "occupational diseases." RCW 51.08.100 ("Injury"); RCW 51.08.140 ("Occupational Disease"). " 'Injury' means a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditions as result therefrom." RCW 51.08.100. By contrast, RCW 51.08.140 defines an occupational disease as "such disease or infection as arises naturally and proximately out of employment."

Specifically, for an occupational disease claim, a worker is entitled to benefits under the IIA if the disease "arises naturally and proximately out of employment." RCW 51.08.140. "Arise[s] proximately" means that employment conditions "must be the proximate cause of the disease . . . so that the disease would not have been contracted but for the condition existing in the extrahazardous employment.' " Dennis v. Dep't of Labor & Indus., 109 Wn.2d 467, 477, 745 P.2d 1295 (1987) (quoting Simpson Logging Co. v. Dep't of Labor & Indus., 32 Wn.2d 472, 479, 202 P.2d 448 (1949)). The "naturally" requirement

is separate from the "proximately" requirement. <u>Dennis</u>, 109 Wn.2d at 481. To show their disease "arises naturally" out of employment, a worker must establish that the disease "came about as a matter of course as a natural consequence or incident of distinctive conditions of his or her particular employment." <u>Id.</u> at 479, 481. "The conditions need not be peculiar to, nor unique to, the worker's particular employment." <u>Id.</u> The <u>Dennis</u> court further explained,

> The worker, in attempting to satisfy the "naturally" requirement, must show that his or her particular work conditions *more probably caused his or her disease or disease-based disability than conditions in everyday life or all employments in general*; the disease or disease-based disability must be *a natural incident of conditions of that worker's particular employment*. Finally, the conditions causing the disease or disease-based disability must be conditions of *employment*, that is, conditions of the worker's particular occupation as opposed to conditions coincidentally occurring in his or her workplace.

<u>Id.</u> (emphasis added).

In an appeal to the superior court, the Board's decision is prima facie correct under RCW 51.52.115, and a party attacking the decision must support its challenge by a preponderance of the evidence. <u>Ruse v. Dep't of Labor & Indus.</u>, 138 Wn.2d 1, 5, 977 P.2d 570 (1999). In such an appeal, "either party shall be entitled to a trial by jury upon demand, and the jury's verdict shall have the same force and effect as in actions at law." RCW 51.52.115. "Where the court submits a case to the jury, the court shall by instruction advise the jury of the exact findings of the board on each material issue before the court." <u>Id.</u> "Appeal shall lie from the judgment of the superior court as in other civil cases." RCW 51.52.140.

I. <u>Proposed Instruction</u>

7

Douglas argues the trial court erred by refusing to give his proposed "compensable consequences" instruction. Generally, "[w]hether to give a certain jury instruction is within a trial court's discretion and so is reviewed for abuse of discretion." Fergen v. Sestero, 182 Wn.2d 794, 802, 346 P.3d 708 (2015). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

"If a party's theory of the case can be argued under the instructions given as a whole, then a trial court's refusal to give a requested instruction is not reversible error." Anfinson v. FedEx Ground Package Sys., Inc., 159 Wn. App. 35, 45, 244 P.3d 32 (2010). Jury instructions are sufficient if they allow each party to argue its theory of the case, are not misleading, and when read as a whole, properly inform the trier of fact of the applicable law. City of Bellevue v. Raum, 171 Wn. App. 124, 142, 286 P.3d 695 (2012). " '[A]n instruction that contains an erroneous statement of the applicable law is reversible error where it prejudices a party.' " Gosney v. Fireman's Fund Ins. Co., 3 Wn. App. 2d 828, 863, 419 P.3d 447 (2018) (quoting Cox v. Spangler, 141 Wn.2d 431, 442, 5 P.3d 1265 (2000)). "Error is not prejudicial 'unless it affects, or presumptively affects, the outcome of the trial.' " Gosney, 3 Wn. App. 2d at 863 (quoting Brown v. Spokane County Fire Prot. Dist. No. 1, 100 Wn.2d 188, 196, 668 P.2d 571 (1983)).

Here, Douglas proposed the following instruction:

The Industrial Insurance Act compensates for any condition from primary industrial injury; or, in other words, it rejects no element of

> disability if it has accrued in consequence of the first hurt, or as an aggravation arising from any collateral contributing cause. However, the test for determining when an alleged consequential, and therefore compensable, injury exists remains whether there is a proximate cause between the original industrial injury and the impairment or need for medical treatment that is alleged to have arisen in some consequence thereof.[4]

He argues that the instruction was an accurate statement of the law, which establishes that "initial work-related injuries or aggravations of pre-existing conditions can lead to further complications," and thus are compensable under the IIA. Douglas claims this instruction was important because his theory of the case was aggravation: his "arduous work history" contributed to the wear and tear in his right shoulder, the shoulder deteriorated to the extent that he suffered an industrial injury that would not have occurred but for the wear and tear, and after healing, his shoulder popped during an expected activity.

While Douglas claims he was prevented from proposing a "compensable consequences" instruction, that doctrine was not at issue based on the facts presented at trial. "Washington has recognized the rule, referred to as the compensable consequences doctrine, which establishes that if treatment performed for an industrial injury causes complications or aggravates the injury, the claim covers *the sequelae of treatment*." Clark County v. Maphet, 10 Wn. App. 2d 420, 438, 451 P.3d 713 (2019) (emphasis added). The covered consequences include "[w]hen a workman is hurt and removed to a hospital, or is put under the care of a surgeon." Ross v. Erickson Constr. Co., 89 Wash. 634,

---

[4] This instruction cited to four cases, two of which were decisions from the Board of Industrial Insurance Appeals. Ross v. Erickson Constr. Co., 89 Wash. 634, 155 P. 153 (1916); McDougle v. Dep't of Labor & Indus., 64 Wn.2d 640, 644, 393 P.2d 631 (1964); In re: Iris Vandorn, BIIA Dec. 02 11466 (2003); In re: Arvid Anderson, BIIA Dec. 65 170 (1960).

647, 155 P. 153 (1916) (reasoning such a worker "is still, within every intendment of the law, in the course of his employment and a charge upon the industry, and so continues as long as his disability continues."). Further, "*the aggravation by malpractice* of an injury does not become an intervening cause of damages, but is incidental to the original injury." Anderson v. Allison, 12 Wn.2d 487, 492, 122 P.2d 484 (1942) (emphasis added). Here, Douglas does not claim that subsequent *treatment* for an industrial injury caused complications or aggravated the injury. Rather, he argues that the "water bottle incident" was "a compensable consequence and not an intervening cause" of his shoulder problems. The compensable consequences doctrine does not apply in such circumstances.

Regardless of whether his proposed instruction was properly described as a "compensable consequences" instruction, Douglas cites to McDougle v. Dep't of Labor & Indus., 64 Wn.2d 640, 641, 393 P.2d 631 (1964), to argue it was necessary to help the jury understand that an occupational disease can manifest via a non-work-related event.[5] In McDougle, the worker filed a claim for a low-back injury while working, in which he suffered a strain and aggravation of a pre-existing osteoarthritic condition. 64 Wn.2d at 641. The Department later closed his claim, and it included an award for permanent partial disability for 30 percent. Id. He later reinjured his low back condition while lifting a load of grain to assist a relative and sought to reopen his injury claim. Id. at 641-42. The Department denied the application, based on the belief that "such aggravation was due to a

---

[5] Douglas v. Dep't of L&I, No. 85945-5-I (Jan. 23, 2025), at 5 min., 4 sec., through 7 min., 2 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025011574/?eventID=2025011574.

new intervening independent cause, namely, lifting a sack or sacks of grain." Id. at 643. The Washington Supreme Court disagreed and remanded the claim, holding the "reasons given for not reopening the claim do not constitute a sufficient justification for that action." Id. at 646. It reasoned that a permanent partial disability based on a back injury does not automatically preclude an individual from doing any lifting and, thus, does not necessarily act as an intervening cause if reinjury occurs. Id. at 645-46. Rather, the court specified that the "test to be applied . . . is whether the activity which caused the aggravation is something that the claimant might reasonably be expected to be doing, or whether it is something that one with his disability would not reasonably be expected to be doing." Id. at 645.

But McDougle addresses "aggravation" in the context of reopening a preexisting claim. We have previously noted McDougle addressed a "claimant's attempt to reopen a closed claim for aggravation of the covered injury" and held that "McDougle should be limited" to reopening aggravation claims. Dep't of Labor & Indus. v. Shirley, 171 Wn. App. 870, 883, 288 P.3d 390 (2012). The Shirley court explained that "whether a claimant's conduct is reasonably expected is determined by whether the claimant's conduct is 'such as could reasonably be expected of a [person] with [their] [department-established] disability,' not the claimant's 'subjective personally known condition as of the date of the aggravation.' " Id. at 883 (quoting Scott Paper v. Dep't of Labor & Indus., 73 Wn.2d 840, 848, 440 P.2d 818 (1968)). And in this case, though Douglas had attempted to reopen his July 2015 injury claim, the Department denied the

11

request, and the Board dismissed Douglas's appeal of the denial. Douglas's current claim is for an occupational disease, not aggravation of the preexisting covered injury. Moreover, unlike in McDougle, Douglas was not assessed to have any permanent disability for the prior covered injury. McDougle does not address the "compensable consequences doctrine" and does not support the argument that the proposed instruction was improperly denied.

Most importantly, reading the instructions together, the instructions did not limit Douglas's ability to argue his theory of the case that "the arduous work history contributed to the wear and tear in his right shoulder" and the aggravation of the condition stemmed not from a new, independent cause of reaching for a water bottle, but from his occupation. First, instruction 12 defined "proximate cause," stating, "A cause of a condition or disability is a proximate cause if it is related to the condition or disability in two ways: (1) the cause produced the condition or disability in a direct sequence unbroken by any new, independent cause, and (2) the condition or disability would not have happened in the absence of the cause." Additionally, instruction 12 emphasized, among other things, that "[t]he law does not require that the work conditions be the sole

proximate cause" of the later condition or disability.[6]

Instruction 14 defined occupational disease, the basis for Douglas's current claim.[7] The instruction additionally explained how a condition of employment may proximately cause or aggravate a worker's preexisting disease: "A disease arises proximately out of employment if the conditions of the worker's employment proximately caused or aggravated the worker's disease." This instruction was an accurate statement of the law, as an IIA-covered occupational disease must "arise[] naturally and proximately out of employment." RCW 51.08.140.

Instruction 15, which the Department opposed, discussed the aggravation theory in the context of an occupational disease claim:

---

[6] Instruction 12 stated,

A cause of a condition or disability is a proximate cause if it is related to the condition or disability in two ways: (1) the cause produced the condition or disability in a direct sequence unbroken by any new, independent cause, and (2) the condition or disability would not have happened in the absence of the cause.

There may be one or more proximate causes of a condition or disability. For a worker to be entitled to benefits under the Industrial Insurance Act, the work conditions must be a proximate cause of the alleged condition or disability for which entitlement to benefits is sought. The law does not require that the work conditions be the sole proximate cause of such condition or disability.

[7] Instruction 14 defined "occupational disease" as follows:

An occupational disease is a disease or infection that arises naturally and proximately out of the worker's employment.

A disease arises naturally out of employment if the disease comes about as a matter of course as a natural consequence of distinctive conditions of the worker's employment. It is not necessary that the conditions be peculiar to, or unique to, the particular employment. A disease does not arise naturally out of employment if it is caused by conditions of everyday life or of all employments in general.

A disease arises proximately out of employment if the conditions of the worker's employment proximately caused or aggravated the worker's disease.

If you find that:

(1) Before the occupational disease, Mr. Douglas had a bodily condition that was not disabling or requiring treatment; and
(2) Because of the occupational disease the pre-existing condition was lighted up or made active;[8]

Then Mr. Douglas is eligible for benefits for his need for disability and/or treatment even though Mr. Douglas' disability and/or need for treatment may be greater than it would have been for a person in the same circumstances without that pre-existing condition.

A worker may not be eligible for benefits, however, for any treatment or disabilities that resulted from the natural progression of the pre-existing condition independent of this occupational disease.

Instruction 15 allowed Douglas to argue that even if his occupational disease was asymptomatic prior to the water bottle incident, it was not merely the result of the natural progression of his pre-existing condition (cleidocranial dysostosis).

In closing, Douglas expressly stated that while evidence had been presented about the 2015 shoulder strain and the water bottle incident, "[w]e're not here for these two things." Instead, Douglas explained, "what we need to consider is why did his shoulder dislocate? . . . It's because the long history of work that he's done. All that wear and tear on his shoulder joint." Later in closing, he argued, "[T]he big picture here is, did [his] arduous work history worsen his right shoulder condition? That's all you have to answer." Further, he argued that "the hard work he's done coupled with the incidents that have occurred, those have further aggravated and worsened his shoulder condition." Read together,

---

[8] The "lit up" doctrine recognizes that "if an injury lights up or makes active a latent or quiescent infirmity or weakened physical condition occasioned by disease, then the resulting disability is to be attributed to the injury, and not to the preexisting physical condition." Zavala v. Twin City Foods, 185 Wn. App. 838, 860, 343 P.3d 761 (2015).

the instructions allowed Douglas to argue his theory that his long work history had worn down his shoulder; the water bottle incident was not a new and intervening cause of his shoulder conditions, but rather, the incident had "lit" them up; and those conditions were covered occupational diseases. The trial court did not err by denying Douglas's proposed "compensable consequences" instruction.

## II. Special Verdict Forms

Next, Douglas contends the first question on the verdict form was "inconsistent with the jury instructions" and "confused the jury when it subsequently asked the same thing in five separate questions." Thus, he argues that the trial court erred when it refused to change the special verdict form, as the contents of the form were misleading and the jury's questions during deliberations highlighted this issue. We disagree.

"Where the court submits a case to the jury, the court shall by instruction advise the jury of the exact findings of the board on each material issue before the court." RCW 51.52.115. The Board's decision is prima facie correct, and the burden of proof is on the party attacking the decision. RCW 51.52.115;[9] Ruse, 138 Wn.2d at 5. The jury must not only be instructed about challenged findings,

---

[9] RCW 51.52.115 describes the process for an appeal from a Board decision:

> The hearing in the superior court shall be de novo, but the court shall not receive evidence or testimony other than, or in addition to, that offered before the board or included in the record filed by the board in the superior court as provided in RCW 51.52.110. . . . In all court proceedings under or pursuant to this title the findings and decision of the board shall be prima facie correct and the burden of proof shall be upon the party attacking the same. If the court shall determine that the board has acted within its power and has correctly construed the law and found the facts, the decision of the board shall be confirmed.

but it must also be asked to decide whether those findings were correct. RCW 51.52.115. Review at the trial court of a Board decision is unique in that it involves, among other things, a request that the jury " 'return a special verdict form evaluating the correctness of the disputed board findings.' " Lewis v. Simpson Timber Co., 145 Wn. App. 302, 316, 189 P.3d 178 (2008) (quoting Buffelen Woodworking Co. v. Cook, 28 Wn. App. 501, 503-04, 625 P.2d 703 (1981)).

The propriety of a special verdict form is reviewed under the same standards as jury instructions. Capers v. Bon Marche, Div. of Allied Stores, 91 Wn. App. 138, 142, 955 P.2d 822 (1998). "Essentially, when read as a whole and with the general charge, the special verdict must adequately present the contested issues to the jury in an unclouded, fair manner." Id. (citing Lahmann v. Sisters of St. Francis, 55 Wn. App. 716, 723, 780 P.2d 868 (1989).

Pursuant to RCW 51.52.115, the court was required to instruct the jury about the Board's challenged findings and to ask the jury to decide whether the challenged findings were correct. Accordingly, instruction 9 explained,

> The Board made the following material findings of fact: Mr. Douglas's conditions diagnosed as right shoulder glenohumeral osteoarthritis; degenerative right labral tear, atrophy of the right rotator cuff, disarticulation of the long head biceps tendon of the right arm/shoulder, and right shoulder strain did not arise naturally and proximately out of the distinctive conditions of his employment.

Then, Question 1 on the special verdict form asked:

> Was the Board of Industrial Insurance Appeals correct in deciding that: Mr. Douglas' conditions diagnosed as right shoulder glenohumeral osteoarthritis, degenerative right labral tear, atrophy of the right rotator cuff, disarticulation of the long head biceps tendon of the right arm/shoulder, and right shoulder strain did not

16

arise naturally and proximately out of the distinctive conditions of his employment?

Question 1 satisfied the obligation under RCW 51.52.115 to instruct the jury on the challenged Board finding, as it is a verbatim recitation of the Board's findings in the form of a "yes or no" question.

Immediately beneath Question 1, the instructions state, "DIRECTION: If you answered 'yes' to Question 1, do not answer any further questions. If you answered 'no' to Question 1, answer Questions 2, 3, 4, 5, and 6." In turn, Questions 2 through 6 likewise tracked the language from the Board's findings except each focused on only one of the five conditions. The Department contends Questions 2 through 6 were necessary to understand the scope of any verdict in Douglas's favor.[10] Based on the facts in this record, we agree.

Nevertheless, Douglas argues that the two questions the jury asked during deliberations show that the jury was confused and ultimately unable to follow instructions, and, thus, the special verdict form prejudiced the proceedings. However, "questions from the jury are not final determinations, and the decision of the jury is contained exclusively in the verdict." State v. Miller, 40 Wn. App. 483, 489, 698 P.2d 1123, rev. denied, 104 Wn.2d 1010 (1985). "The [jurors'] individual or collective thought processes leading to a verdict . . . cannot be used to impeach a jury verdict." State v. Ng, 110 Wn.2d 32, 43, 750 P.2d 632 (1988). For example, in Ng, the defendant claimed that the court's robbery instructions

---

[10] For example, Question 2 asks, "Was the Board of Industrial Insurance Appeals correct in deciding that: Mr. Douglas' condition diagnosed as right shoulder glenohumeral osteoarthritis did not arise naturally and proximately out of the distinctive conditions of his employment?" Questions 3 through 6 similarly ask the same question, respectively substituting in and underlining each individual condition.

created ambiguity because the instruction defining robbery for felony murder purposes referred explicitly to duress, but the "to convict" robbery instruction did not. Id. at 43. In support of his "ambiguity" argument, Ng pointed to the jury's question as to whether the provided duress instruction applied to the lesser included charges, copies of the instructions marked by the jury during deliberations, and statements made by individual jurors after trial. Id. The court reasoned that "the jury's question does not create an inference that the entire jury was confused, or that any confusion was not clarified before a final verdict was reached." Id. Further, the court refused to speculate as to the meanings of jurors' markings on the instructions, and the "post-verdict statements regarding matters which inhere in the verdict" could not be used to attack the verdict. Id. at 43-44. The court ultimately recognized that "the trial court has discretion whether to give further instructions to a jury after it has begun deliberations" and concluded, "Ng has shown no abuse of discretion in the court's decision to refer the jurors to the instructions as given." Id. at 42, 44.

As in Ng, in this case, the jury's questions do not create an inference that any confusion was not clarified before the final verdict was reached. After the court answered the second question, within an hour, the jury returned a verdict; it filled out the special verdict form correctly, i.e., it answered "no" to the first question and did not answer the additional questions. And when the trial court polled the jury, each juror confirmed that the verdict was their verdict as a jury.

Douglas further argues the verdict form was misleading and inadequate because it failed to include "aggravation" language. However, Douglas did not

18

object to the special verdict form on this ground below. An appellate court "may still review a claimed special verdict form error when the party has properly excepted," but the party must distinctly state the matter to which they object and the ground of their objection. Raum, 171 Wn. App. at 145. "If a party is dissatisfied with a special verdict form, then that party has a duty to propose an appropriate alternative." Id.; RAP 2.5(a). Here, the record reflects that when Douglas objected, he suggested the first question "should read as whether there was an occupational disease claim," but did not suggest any alternative language about "aggravation." We decline to consider Douglas's new argument on appeal that the failure to include "aggravation" language in the special verdict form was error.[11]

Finally, Douglas asserts the trial judge was biased in favor of the Department. As Douglas did not raise this issue below, we decline to review it pursuant to RAP 2.5(a). Additionally, the issue is inadequately argued on appeal. In support of this argument, Douglas highlights only a single statement: in discussing the jury's question about how to read Question 1, the trial court stated that "listing [the conditions] . . . was going to create problems," but it would do so "[be]cause [it] wanted to help the Department" by providing it with an advisory opinion from the jurors. But other than identifying the challenged statement and quoting from State v. Solis-Diaz, 187 Wn.2d 535, 540, 387 P.3d 703 (2017),

---

[11] Even if we were to consider the merits, " 'a special verdict form need not recite each and every legal element necessary to a particular cause of action where there is an accurate accompanying instruction.' " Raum, 171 Wn. App. at 148 (quoting Capers, 91 Wn. App. at 144). As noted above, instruction 14 defined "occupational disease," and instruction 15 explained "aggravation" in the context of an occupational disease claim.

Douglas does not engage with the applicable legal test or explain how it applies to facts in his case.

In sum, the trial court did not err in providing the special verdict form to the jury. The special verdict form, along with the instructions, allowed the parties to argue their theories of the case, did not mislead the jury, and properly informed the jury of the law to be applied.

III.    Attorney Fees

Douglas requests an award of attorney fees and costs pursuant to RAP 18.1 and RCW 51.52.130. RCW 51.52.130 allows an award of attorney fees to a worker "[i]f, on appeal to the superior or appellate court from the decision and order of the board, said decision and order is reversed or modified and additional relief is granted to a worker." Because we affirm the judgment and order, we deny Douglas's request for attorney fees.

_Chung, J._

WE CONCUR:

_Feldman, J._                          _Díaz, J._

20